ARTHUR H. HOWLAND & another *vs.* GEORGE F. BLAKE
MANUFACTURING COMPANY.

Suffolk.    May 27, 1892. — June 22, 1892.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Libel — Pleading — Evidence — Publication — Corporation — Master and Ser-*
*vant — Privileged Communication — Law and Fact.*

In an action for libel, in which the declaration alleges the publication of several
defamatory statements, and the answer contains a general denial, and sets up
generally the truth of the alleged statements, the defendant may show in evi-
dence the truth of such statements, the plaintiff having failed to move before
trial for a more specific statement of defence.

In an action for libel, by publishing a defamatory article relating to the plaintiff's
character and his performance of a certain contract, if the defendant introduces
evidence that the plaintiff failed to perform the contract, and that he supplied
and endeavored to supply work and materials inferior to those called for by
the contract, the plaintiff is not entitled to put in evidence his business reputa-
tion and his individual reputation before he entered into the contract.

At the trial of an action against a corporation for libel contained in a printed
report of an investigating committee appointed by a town with which the plain-
tiff had a certain contract, the plaintiff requested the judge to rule, in substance,
that if the officers having charge of the business affairs of the defendant corpo-
ration, or its agents, in the course of their employment, participated in the
preparation of the libel by furnishing any part of the libellous matter, and
after it was printed circulated it, or if such officers furnished, or permitted any
employee of the corporation to furnish, any part of the libel, and after it was
printed, circulated, or aided in circulating it, or if any agent or servant of the
corporation in the general course of his employment furnished any part of the
libel, and after it was printed circulated it, the corporation would be liable as
fully as if it had composed and printed the whole libellous article.   The judge
declined so to rule, and instructed the jury fully as to what would constitute
a publication by the defendant. *Held*, that the plaintiff had no ground of
exception.

At the trial of an action against a corporation for libel contained in a printed
report of an investigating committee appointed by a town with which the plain-
tiff had a certain contract, the plaintiff is not entitled to have the jury instructed
that, if they found that the corporation, by its servants or agents, in the usual
course of their employment, and in the interest of the corporation, furnished
any part of the libellous statements, or were in any way concerned or aided in
the production or publication of the libel, the corporation would be liable.

The mere furnishing by one person of some of the materials used by another in
the preparation of an alleged libellous article, does not constitute a publication
of it by the former, if, when printed, the article as a whole is something very
different from the materials so furnished by him.

A corporation is liable for publishing a libel, if the publication is shown to have

been made by its servants or agents in the course of their employment, and within the apparent scope of their authority.

If A. gives to B. a copy of an article containing an alleged libel on C., there having been no previous publication by A., and B., in procuring such copy, acted as C.'s agent and at his request, and such publication was procured with a view to bringing an action, the publication is privileged.

If A., in honest response to an inquiry by the bank in which he keeps his deposits as to B. and his standing, sends to the bank a copy of an article containing·an alleged libel on B., who has a contract with a town for the building of a system of water works, which copy ·is afterwards forwarded by the bank to another bank, of which it is the local correspondent here, in a city in another State, and is, through the latter bank, communicated to the members of the water works committee of the government of that city by another member, who is also an officer of the latter bank, and for whom the inquiry by the bank was made, such publication by A. is privileged.

In an action for libel, if the defence of privilege is set up, it is proper for the jury to determine the facts on which the question of privilege depends, and, such facts having been determined, it is for the court to say, as matter of law, whether a privileged occasion is shown; and on conflicting and uncertain evidence, it is proper to instruct the jury in regard to what constitutes· a privilege, and leave them to say, on the evidence, whether the essential facts are proved.

TORT, by Alfred H. Howland and George A. Ellis, copartners doing business as Howland and Ellis, for libel.

' The declaration alleged that the plaintiffs were civil engineers and contractors, and that the defendant published, circulated, and caused to be published and circulated, a false and malicious libel concerning the plaintiffs, a copy whereof was annexed, . whereby the plaintiffs were greatly damaged in their business as well as in their reputation, and especially had suffered great damage and loss of profits on contracts and employment in their business as civil engineers and contractors for the building and construction and superintendence of the construction of water works.

The plaintiffs also filed, in support of their allegation of special damage, a specification of the contracts claimed to have been lost by reason of the alleged libel.

The libel complained of was contained in the report of an investigating committee appointed by the inhabitants of the town of Maynard, which was printed in a newspaper published in that town, and which recited that a contract in writing was made on August 14, 1888, by the water commissioners of the town with the plaintiffs, who agreed to build a complete system of water works for the town for a certain sum, to be done on or

before December 1, 1888; that on said December 1 but a small portion of the works had been completed, and the plaintiffs had not exerted themselves to complete the same; that the plaintiffs after said December 1 applied to the water commissioners for an extension of time, which was granted upon the condition that the plaintiffs would sign a proper extension in writing, which the commissioners prepared and submitted to them for their approval; that the plaintiffs refused to sign the extension; that the committee believed that the written extension was just and equitable to both parties, taking into consideration the time of the year, "and the manner and way Howland and Ellis had been conducting and prosecuting the work, and the additional light and knowledge that they had received since August 14th last concerning the characters and financial standing of Howland and Ellis, especially in regard to Howland"; that the commissioners, on December 17, notified the plaintiffs in writing to quit work; that the committee found "that the greater part of the work performed before December 1 was not done in accordance with the terms of the contract, and that the water commissioners were justified in withholding their approval and acceptance of the same," and the particulars in which the work was claimed to be defective were specified in detail; and that the committee found that the specifications in the hands of the commissioners differed from those in the possession of Howland, and, knowing the commissioners' standing, "we determined to know Howland's. This was the result. The first man we interviewed on the standing of Howland, who was a man your whole committee had confidence in, told us that Howland would steal, that he caught him at it, and gave instructions to all his help to watch him whenever he came into his place of business; that his ability as civil engineer was not to be questioned, but that he was dishonest, a smooth, plausible, oily talker, and that his note for a thousand dollars was not worth ten cents. We followed this up among other well known business concerns, and were unable to find anything to his advantage either as a square business man, or as to his financial standing. Mr. McClellan sent him to Montgomery, Ala., where he was working for him under a salary, to obtain the franchise to put in water works in that place. Howland took the franchise out in his own name, and

returned to Boston, and tried to sell it to McClellan, his employer. McClellan told him that he guessed he would dispense with his services. The Chapman Valve Company, in whose employ he was, instructed him to get up a book illustrating and describing their works. He did so; got the book copyrighted in his own name, and tried to make them pay him before he would allow them to dispose of the books. He went to the Blake Manufacturing Company, and tried to induce them to construct the pumps called for in the specifications in the possession of the water commissioners of poorer and cheaper materials, and cut down the cost two thousand dollars, saying that the water commissioners will never know the difference, and they will answer all purposes. The Blake Manufacturing Company informed him they did not do that kind of business." The report went on to recite that the committee decided that the specifications in the hands of the commissioners were the right ones; that, after the committee had made this investigation in regard to Howland, he came before the committee and made certain favorable statements regarding himself and relating to the work, " but could give us no light on why he permitted the work to be performed in this unsatisfactory manner, — we had investigated him before we met him "; that, under the contract, the plaintiffs were to satisfy the commissioners of the discharge of all liens before they were entitled to pay; and that the plaintiffs had received from the town a certain sum, and transferred to one Rice all their rights and claims against the town to a certain amount, " and it looks to us as if Howland and Ellis did not intend to pay for the material now in town, or for the labor performed." The report then reflected severely upon one of the water commissioners named Nyman, and stated that " we believe he has aided and abetted Howland and Ellis, and worked against and wilfully and intentionally neglected the interests of the town; that he is ready and willing to aid them in their scheme to swindle the town "; and closed as follows: " We recommend that the town have nothing more to do with Howland and Ellis, except to settle up with them, if they can in any way that is for the interest of the town, and if not, oppose them in every way possible; for we believe that Howland and Ellis have no claim against the town under their contract which entitles them to recover anything."

The answer contained a general denial, set up generally the truth of the alleged libellous statements, and averred that the publication was a privileged communication.

Trial in the Superior Court, before *Blodgett*, J., who allowed a bill of exceptions, in substance, as follows.

There was evidence tending to show the following facts. The plaintiffs are civil engineers and contractors for water works, with an office in Boston, and a large business in twelve or thirteen of the United States. Some time in August, 1888, the plaintiffs contracted with the town of Maynard to construct in and for said town a system of water works; work was begun thereon in August, 1888, before the signing of the contract, and a contract was signed some time in September, 1888. Three citizens of the town of Maynard, namely, Thomas Hillis, Thomas Naylor, and Frank W. Nyman, were elected water commissioners at a regularly called meeting of said town, in June, 1888, and were intrusted with the superintendence of the construction of the water works, and with the power to make and sign contracts for the work. The work was not completed on December 1, 1888, the plaintiffs contending that the time had been extended; and shortly thereafter the plaintiffs were forbidden by the water commissioners to proceed further with the work. Afterwards various disputes, controversies, and differences arose between the plaintiffs and the water commissioners respecting the contract and its execution, and on January 24, 1889, the town of Maynard, at a meeting regularly and duly called for that purpose, appointed a committee consisting of A. G. Haynes, L. Maynard, George Flood, Augustus Newton, H. H. McGrail, Joseph W. Reed, and A. D. Holt, and empowered them to investigate the trouble between the water commissioners and the plaintiffs, and instructed the committee to report concerning the same to the town. The committee proceeded to investigate said matters, and made a written report of their investigation to the town at a special town meeting on March 8, 1889. The report was adopted by the town at its special meeting, and ordered to be printed and circulated, and the full text of the report was printed in the Maynard Enterprise, a newspaper published in said Maynard, March 9, 1889. The report in the Maynard Enterprise contained and constituted the alleged libel

on the plaintiffs. The defendant is a corporation engaged in the business of manufacturing pumps for steam and water purposes and pumping machinery, and has stores and offices for the transacting of its business in Boston, New York, and Philadelphia, and has factories in Warren and Cambridge, in this Commonwealth; E. C. Turner is treasurer and general manager of said corporation, and George Foran and Wilbur D. Fiske are in the employ of said corporation as salesmen, with power to negotiate contracts of sale and manufacture.

It was admitted by the defendant that E. C. Turner was the treasurer and one of the directors, having general financial charge of the business of the defendant corporation in 1889, and up to and including the date of the trial.

John F. Wood, called by the plaintiffs, testified that he was the publisher of the Maynard Enterprise in 1889, and identified the paper containing the alleged libel as having been printed in his establishment in Maynard, on March 9, 1889; that he should judge that he printed from three hundred to five hundred copies; and that he thought he also printed it in another form.

Thomas Hillis, called by the plaintiff, testified that in 1888 and 1889 he was chairman of the board of water commissioners of the town of Maynard; that prior to August 10, 1888, the witness had received bids for machinery and boilers from the defendant through Foran, and on said August 10 the witness notified Foran that the water commissioners had accepted the defendant's specifications; that shortly afterwards a contract for the water works at Maynard was signed by the plaintiffs and the water commissioners; that some time after May, 1889, the town of Maynard placed its order with the defendant for the pumping machinery; and that the defendant had since put in the pumping machinery in accordance, substantially, with specifications contained in the contract between the town and the plaintiffs, with only a slight variation to reduce the price.

Upon cross-examination, the witness testified at great length regarding various statements in the alleged libel, to wit, to the making of changes in the contract with the town after the same was signed and delivered, to imperfections and defects in the work that was performed under said contract upon the water works, to conversations in regard to said defects with the plain-

tiffs and their agents, and in reference to the payment of money under said contract, and to conversations with the plaintiffs in reference to an extension of said contract.   The plaintiffs objected to this evidence, upon the ground that, under the answer, the defendant should not be permitted to introduce any evidence of the truth of the matters contained in the alleged libel, because it had not specifically set up the truth of any fact except in the general answer.   The judge admitted the evidence, and the plaintiffs excepted.

Joseph W. Reed, called as a witness for the plaintiffs, testified that he was one of the committee appointed by the town of Maynard to investigate " the Howland and Ellis matter "; that he went to the office of the defendant with other members of the committee, and there saw Foran and Turner, who were told by them that they were a committee from the town of Maynard; that they gave the committee information, the substance of which was afterwards introduced into the report; that the report as it appeared in the Maynard Enterprise was the same as the report to the town; that on March 11 the witness met Foran, who asked the witness to send him some of the Maynard Enterprise extras; that the witness purchased twenty-three of these papers in Maynard, and sent them to Foran at the defendant's office; and that Foran subsequently paid him for these papers.

George Flood, called as a witness for the plaintiffs, testified that he was a member of the committee of investigation; that he went to the defendant's office with the other members of the committee; and he corroborated the evidence of Reed as to the conversation with Foran and Turner in regard to the plaintiffs, and the incorporation of its substance into the report.

Albert F. Hall, called as a witness by the plaintiffs, testified that he was an engineer and draughtsman in the employ of the defendant; that some time after March 9, 1889, Turner came into the office provided for the witness by the defendant, and gave him a copy of the Maynard Enterprise extra, containing the report of the investigating committee; that the witness read the paper, and showed it to one Kohler, his assistant, who read it; that the witness handed it to one Howard, his pattern maker, and he read it, and returned it to the witness, after which

the witness returned the paper to Turner; and that the witness had asked Turner for the paper, having heard before of its publication.

Wilbur D. Fiske, called as a witness for the plaintiffs, testified that he was a salesman in the employ of the defendant; that a portion of his duties consisted in making contracts for the supply of pumping machinery to water companies or towns, in connection with it; that he made a proposal on behalf of the defendant to the plaintiffs; that some time during the spring of 1889 he made a contract through the water commissioners with the town of Maynard for pumping machinery; that he had seen one of the Maynard Enterprise extras containing the report in the office of the defendant, the first one he saw being in the hands of Foran, shortly after it was published; that after that he saw three or four more of them, and knew that Foran had some of these papers; and that Foran gave him one, which he laid on his desk, but did not show it to anybody.

Myron L. Henry, called as a witness for the plaintiffs, testified that he was an accountant in the employ of the defendant; that he had seen some of the Maynard Enterprise extras in the rear office of the defendant prior to October, 1889; that the package containing the papers had been given him by Foran, but how long previously to October he could not state; that he had heard in the office of the defendant that there was such a paper previously to the time of his receiving the package; that there were twenty copies in this package; that he took one out, read it, and put it back, and placed the package in the safe of the defendant by direction of Foran.

John G. Berry, called as a witness for the plaintiffs, testified that he was a civil engineer in the employ of the plaintiffs; that on March 15, 1889, he went to the office of the defendant, and there saw Foran, who gave him a copy of the Maynard Enterprise extra, saying, " Read it at your leisure, and show it to your water committee "; that the witness had told Foran that he had friends in Marion, Ohio, who were interested in the water works which were to be put in there by the plaintiffs; that thereupon Foran gave a start, and said, " Hold on a minute, I have got something to show you "; and that Foran then went to his desk, got out the paper, and handed it to him.

On cross-examination, the witness testified that he went there with the purpose and intention of getting one of those papers if he could; and that he did not tell Foran that he was in the plaintiffs' employ.

James Adams, called as a witness for the plaintiffs, testified that he was cashier of the Blackstone National Bank in Boston; that Turner was a shareholder in the bank, and the defendant kept a large deposit there; and that George F. Blake, the president of the defendant company, was one of the directors of the bank. The witness further testified as follows: "Some time after March 11, 1889, I received a paper from Mr. Turner, which was folded in the ordinary way. I never examined the paper and did not read it. I understood it contained a report of the town committee in relation to a transaction with which Howland and Ellis had been connected. I folded the paper, and mailed it to our correspondent at Peoria, Illinois. It was directed to the First National Bank of Peoria, Illinois. Mr. W. E. Stone was the cashier of that bank, and, from information recently received, I suppose a person by the name of Bergen was connected with that bank. I do not recall that there was any correspondence between me and any one in connection with that paper before I sent it. I am not aware that I informed Mr. Turner of the use I intended to make of it. I had sent an inquiry to him that I would like to know. This inquiry was sent by Mr. Moore, one of the clerks in the employ of the Blake Manufacturing Company, who came to our bank, and who had been accustomed to do the banking business. This paper was handed to me by Mr. Moore, to the best of my knowledge. When he handed it to me he said substantially, 'Here is the paper, here is the report of the committee,' or something similar to that. Before I received the information that I would have a report sent to me, I am under the impression that I knew there was a report printed, but cannot tell from whom I learned it. The message I sent to Mr. Turner was, that, if he had any information in regard to the standing of Howland and Ellis, I should be happy to hear from him at any time."

On cross-examination, the witness testified: "My impression is that there was a request for this information, and it came by letter from the First National Bank of Peoria. I have searched

for that letter and have been unable to find it. . . . It was a brief letter, and there was nothing in it to fix in my mind the date of its receipt.   The First National Bank of Peoria has an account with the Blackstone National Bank of Boston, and it is the only bank in Peoria that has any business dealings and affairs with us.   It has been our correspondent for some half-dozen years.   When I received the inquiry I considered of whom I would make inquiries regarding it, and do not remember making inquiries from any other person than the Blake Company."

Charles B. Moore, clerk in the employ of the defendant company, testified as follows: " I have heard there was such a report as that contained in the Maynard Enterprise extra, and I remember taking a paper from Mr. Turner down to the Blackstone Bank.   Mr. Adams, the cashier of the bank, asked me one day what our people knew in regard to Howland and Ellis.   These were the words, to the best of my remembrance.   I am sure there was not anything said as to their financial standing.   I told Mr. Adams we knew nothing about them.   I said that the Blake Company knew nothing about them.   He asked me, ' If you should hear anything, will you kindly let me know ? '   That was all he said that I remember of.   I said I would, and went back to the office.   I spoke to Mr. Turner about it, I could not say whether it was the next morning or the day after it.   I told him Mr. Adams had inquired in regard to Howland and Ellis. He said he could say nothing about them.   Some days after this, when I was in Mr. Turner's office waiting to get the deposit from him to take to the bank, he handed me a paper and asked me to give it to Mr. Adams.   I put the paper in my pocket and gave it to Mr. Adams when I got to the bank.   The paper was folded, and I could not tell exactly what it was.   I did not unfold it, or look at the heading of it, or have any idea what it was, or form any idea about it.   I said to Mr. Adams, ' Here is a paper which Mr. Turner wished me to give you.'   Up to that time I had never heard of a report, or that any such thing had been printed. . . . I should say four or five days elapsed between the time Mr. Adams spoke to me and the time I got the paper and carried it down to him."

John B. Dean, called as a witness for the plaintiffs, testified that he was a newsdealer in the town of Maynard ;  that he

had sold about five hundred copies of the paper containing the report; that he had had several applications for the papers after they were all sold; that all of them were sold in one day, except a few which were sold on the following Monday; and that he had the entire distribution of them.

James C. Dolan, called as a witness for the plaintiffs, testified that he resided in Peoria, Illinois, and was one of the aldermen of that city during the years 1888 and 1889, and was a member of a special committee to take charge of the water works business; that he first met the plaintiff Howland in the latter part of 1888 or the beginning of 1889; that at that time Howland had gone to Peoria with a proposition to purchase the water works system; that several meetings were held by this committee, but no contract had been awarded up to April 2, 1889, about which time the witness saw a paper containing the alleged libel; that Alderman Bergen, who was a member of the committee and who was also teller of the First National Bank of Peoria, showed it to him; that he also saw it again, and read part of it in the presence of Bergen and a third person; and that he never saw it again, either in the council chamber, or in the rooms where the committee were holding meetings, or anywhere else.

On cross-examination, the witness testified: " I won't say it did n't have an effect on my mind, it most certainly would have an effect; it might be the determining question; it would depend upon what I knew of the people. It would not affect me unfavorably towards Howland, because I was favorably impressed with him, and am to-day."

John Warner, called as a witness for the defendant, testified: " I reside in Peoria, and was mayor of that city in 1888 and 1889, and was a member of the special committee on water works. About the middle of March, I remember seeing a paper similar to the Maynard Enterprise extra. It was handed to me in the mayor's office, by Alderman Bergen. I gazed over it slightly. . . . When it was shown to me by Mr. Bergen no one was present but he and myself. I do not know how he came to show it to me."

Marshall M. Tidd, called as a witness for the defendant, testified:

" I am a civil engineer, carrying on business in Boston; have

been an engineer for something over forty years, and my practice has extended from Nova Scotia to California.

" *Q.* Did you ever give any instructions, Mr. Tidd, to your help or workmen, or subordinates there, to watch Howland whenever he came into your place? *A.* I did; yes, sir.

" *Q.* Has he ever stolen anything from you that you caught him at? *A.* Not that I know of.

" *Q.* Did he ever steal blue prints or plans from you that you caught him at? *A.* Not that I know of.

" *Q.* Have you given instructions to all your help, Mr. Tidd, to watch Mr. Howland when he came into your office? *A.* My present help, I suppose you refer to.

" *Q.* To all of your help. *A.* I am not sure that I could say all, because some have been very temporarily in my employ.

" *Q.* Well, at and about March and February, 1889, had you given such instructions to all your help? *A.* I did, sir."

Wilbur D. Fiske, recalled, testified: " In September or October, 1888, I went to see Mr. Howland, at his office in Boston, in reference to the pumps for the Maynard works. Mr. Howland had sent down for somebody to come to his office, and in response to the message I went. My recollection of the conversation with him is, that he had made some changes in the piping, had left out some recording gauges, and some few things like that, and wanted a specification of machinery leaving out these gauges and double piping, and he wanted the price reduced. He said that Mr. Foran had given a promise or made a promise of a reduction in the price. I took the matter under advisement, figured up the job, and made a reduction in the price. Mr. Foran came into the store the next day, and together we went up and saw Mr. Howland, because Mr. Foran knew more about it than I did. Our conversation was on the reduction of the price. Mr. Howland wanted to reduce the price of the machinery about two thousand dollars. We said we would not reduce the price. Mr. Howland said we had expensive boilers and an expensive boiler maker; that in some other contracts he had a cheaper boiler maker, and engaged an engineer to watch the process of constructing the boilers, and therefore got a good job, and saved several hundred dollars on a pair of boilers, or on boilers, and that we could do the same. We answered, we would not do it.

We said we were not in that kind of business.   Mr. Howland said he could furnish that machinery under our specifications by other builders, and that he was not obliged to have the machinery built by the George F. Blake Manufacturing Company.   He spoke about the water commissioners, and said something in regard to making the pumps cheaper, and that it would be all right providing the water commissioners accepted them.   I don't recollect just how he put it, but that was the substance of it as near as I can recollect, that the water commissioners would not know the difference.   I think he said we had guaranteed that machinery to the commissioners."

On cross-examination, the witness testified as follows : " When I met Howland and Ellis the question in discussion was regarding price.   I don't know as the words ' poorer materials ' were used. The substance of it was to cheapen the whole thing.   One way indicated by Howland was to get a cheaper boiler maker, — to pay less price to our workmen. . . . I think Mr. Howland made us an offer of $10,500 ; our proposition was $11,191.   We went back to Mr. Turner, and reported the offer to him."

Edward C. Turner, called as a witness for the defendant, testified : " I am treasurer of the George F. Blake Manufacturing Company. . . . The matter of the water works at Maynard was first called to my attention in the latter part of July or the first of August, 1888.   Mr. Foran, one of the force, went up there then, and substantially had. charge of the business there.   The first time I saw this newspaper publication was on the forenoon of Saturday, March 9, 1889 ; as I came into the office of the Blake Company Mr. Foran had it in his hand.   Afterwards Foran came to my desk and read it to me ; I was indorsing checks at the time ; on the following Monday he handed me another of those papers ; I sent that to James Adams, cashier of the Blackstone National Bank, in response to his request for information ; I think I sent it that Monday, or a day or two later, I don't know positively ; I sent Mr. Moore, our messenger, to the bank ; I handed it to Moore in my office, and he put it in his pocket ; I never afterwards saw that paper.   Mr. Foran gave me another of those papers, I should think on Thursday or. Friday of that week ; I put this one in my pocket and carried it to my home ; I carried it back again to the city, and stopped at

the factory; I had there some conversation with Mr. Hall on the subject of Maynard. He said he would like to see some of those papers, and I gave him that one, or loaned it to him to read; afterwards he gave it back to me, and I gave it to Foran, and told him to have it locked up carefully; I don't know what Foran did with it. Since that time I have never seen any of these papers about my place, on the desks, or exposed in any way. . . . I remember a committee of men coming to my place some time in February or January, 1889, I should think; I think there were three or four men; I don't remember their names, except that of Mr. Reed, the chairman. When I first saw them they were sitting down around Foran's desk. I was introduced to them by Foran, and they said they were an investigating committee. I was engaged in conversation with them five or ten minutes, I think; I said nothing to them with reference to this water works business at Maynard; I told them that the correspondence was at their disposal, or in sight if they wished to see it; that they were at liberty to look at it if they wished; the correspondence, I think, between the town of Maynard and, I suppose, Howland. I never heard or was told that Howland and Ellis were not favorable to putting in our pumps. When I talked with the investigating committee I did not tell them that Mr. Howland had been trying to bribe us to put in imperfect work or cheaper material. I did not tell them anything of the kind, nor that by reason of his offer to us he was attempting to swindle the town of Maynard. Nothing of that sort was said or intimated. I did not say anything or hear anything said to that committee to the effect that I or the company was ready to back up what we knew about Howland and Ellis in court. I never remember anything of that sort being said."

George F. Foran, called as a witness by the defendant, testified as follows:

"I am a salesman in the employ of the George F. Blake Manufacturing Company. I first saw this paper on the morning of March 9, 1889. I was standing by my desk, and Mr. Naylor came in and handed it to me. I commenced to read it, and before I had finished Mr. Fiske came to the door. I commenced to read it over again and read it entirely through. That same morning I showed the paper to Mr. Turner, and then gave it

back to Mr. Naylor.  I never saw that copy afterwards, and it was never, to my knowledge, in the place or about the premises of the George F. Blake Manufacturing Company again.  At noon on that same day I saw another copy of the paper in the hands of Joseph Reed, chairman of the investigating committee. I asked Mr. Reed if he would let me have that paper ; he said he would not.  Then I asked him if he would get me some of them, and he said he would.  A little after two o'clock on that same day Mr. Reed came to the store and gave me that paper.  I can't tell what was done with that special paper.  On Monday morning, March 11, I had a package of papers at the office.  I opened the package and there were twenty-three papers in it. I have never had any other papers than the twenty-three that came in that package and the one that Mr. Reed gave me.  I put those twenty-three papers in my desk.  Afterwards I took one out and gave it to Mr. Turner.  I never afterwards saw that paper.  I took another one out and gave it to Mr. Fiske.  I don't know what he did with it.  I never saw it afterwards.  Two or three days later I took another and gave it to Mr. Turner.  I don't know what he did with it, and have no knowledge of what became of it.

" In the same week, either Friday or Saturday, I took another of those papers and gave it to Mr. Berry, one of Mr. Howland's employees.  Mr. Berry and Chief Engineer Adamson, of the United States receiving ship Wabash, of the Charlestown Navy Yard, were present in the office at that time.  I had never met Mr. Berry previous to that time.  Mr. Adamson came in first, and I was engaged in conversation with him when Mr. Berry entered.  Mr. Adamson introduced Mr. Berry to me, and told me he had been on a trip with him. . . . Mr. Berry said he had been on either the cruiser Boston or Chicago, and I turned to a photograph in a book and showed him some machinery on the boats, and other things that would be interesting to him, and explained the different styles of machinery to him. When I struck some water works pumping engines, he told me he had recently had some letters from friends at home, and that there was a possibility they might put in a system of water works some time during the summer or fall.  I asked him where he lived.  He said he lived at Marion, Ohio. . . . We then

returned to my desk, and Mr. Berry brought up the subject of water works again, and we went into it quite fully. . . . We talked for some time, and Mr. Berry asked me for my card, saying he would like to know whom he had been talking with. Then he started towards the door, and as we got about to the door, Mr. Berry said, ' I think preliminary surveys have been made by a concern named Howland and Ellis.' I was a little surprised. I said, ' Howland ? ' He said ' Yes, do you know anything about them ? ' I hesitated a moment, and said, ' Is it of special interest to you ? ' He said, ' Yes.' I then went to my desk without saying anything further, took out a copy of the Maynard Enterprise extra, which was folded, and handed it to him, saying, ' This paper contains the report of a committee of the town of Maynard, where the firm of Howland and Ellis had a contract.' He thanked me for it, and put it in his pocket without opening it. We had no further conversation, and they went out. I did not see Mr. Berry after that time until May 2, in Boston. He told me he was working in Boston for Howland and Ellis. . . . On March 19, 1889, I received some instructions from Mr. Turner about these papers, and I went to my desk, took them out, counted them, rolled them up in a brown-paper wrapper, and wrote on it ' Copies of Maynard Enterprise.' 1 gave them to Mr. Henry, and he locked them up in the safe.

" On the same day, a little later, I went there, got the package from Mr. Henry, took out two copies, and gave them to Mr. Turner. They were for the counsel, I believe. That left eighteen in there. On the following day, or the day after, Mr. Turner gave me two papers. I went and obtained the package from Mr. Henry, and put the two papers in, making the number twenty. I have seen the package once or twice very recently. I remember the time when the investigating committee of the town of Maynard came to our place. . . . I had a conversation with them, and after I got through talking with them I thought they would like to see Mr. Turner, and I asked him to come out and speak to them a minute. I brought him out, and introduced them to him. This was the first time I had met that committee, and the only time. Previous to this I had had some conversation with Mr. Howland about this machinery. On August 8 I put in a bid to the water commissioners, and on August 13 Mr.

Howland sent a messenger down for me to come to his office, and in response to this I went to his office. He asked me why I had n't handed the bid to him in answer to his specifications. I told him that there were lots of things in there we did n't believe in; that parts of the pumps he called for we did n't build, and did n't consider necessary; that the water commissioners had advertised for bids, so I had bid to the water commissioners direct. Mr. Howland told me that, as he was engineer for those works, everything that went in would be according to his instructions. I left him at that time, and went down to the office, and came back with a special proposition. After that, the first meeting that I remember seeing him specially was on October 2."

The witness then corroborated the testimony of Wilbur D. Fiske, in substance, as to their interview with Howland on October 2.

Frank W. Nyman, called in rebuttal as a witness for the plaintiffs, testified that he was a water commissioner of the town of Maynard, and was present when the contract referred to in the libel was signed. He was permitted to testify at great length to the circumstances of signing the contract, and to the work performed under the contract by the plaintiffs. The witness was asked the following question: "Before the contract between the town of Maynard and Howland and Ellis was made, did you make any inquiries so as to ascertain the business reputation of Howland and Ellis?" This question was objected to by the defendant. The judge excluded it; and the plaintiffs excepted.

The plaintiffs' counsel then said, "I propose to offer evidence of the business reputation of the plaintiffs and of their individual standing and reputation." This evidence was objected to by the defendant. The judge excluded it; and the plaintiffs excepted.

The plaintiffs requested the judge to instruct the jury, among other things, as follows:

" 1. If the officers having charge of the business affairs of the defendant corporation, or its agents, acting on behalf of the corporation in the course of their employment, participated in the preparation of the libel by furnishing any part of the libellous matter, and after it was printed circulated it, such acts would

make the corporation liable equally with those who wrote it and published or printed it. The corporation would be liable as one of the originators of the libel, or for any damages which might result from its public sale or private circulation.

"2. If the treasurer of the defendant corporation, intrusted with the general superintendence of its business affairs, furnished or permitted any person employed by the corporation to furnish, or assented to the employee furnishing, any part of a libel of the plaintiffs, and after it was printed circulated it, gave it away, lent it, or handed it to any person or persons to be read, then the defendant corporation is liable as the originator, composer, and publisher of all that is contained in the libel. It would be answerable in damages for any injury which the plaintiffs have sustained or reasonably may sustain by reason of its circulation by its agents, officers, servants, employees, or by others.

"3. If any agent, employee, or servant of the defendant corporation in the general course of his employment furnished any part of the libel, and after it was printed circulated it by giving it away, or by handing it to others to be read, the defendant corporation would be liable as fully as if it had composed and printed the whole paper. It would be liable in damages to the plaintiffs for all injuries to the plaintiffs in their business or reputation by the general circulation or sale of the libel.

"4. If the jury find that the defendant corporation, by its servants or agents, in the usual course of their employment, were in any wise concerned or aided in the production or publication of the writing, the corporation is liable.

"5. If the jury find that the defendant corporation, by its servants or agents, in the usual course of their employment, and in the interest of the defendant corporation, provided or furnished any part of the materials and statements contained in the alleged libel which are untrue, the corporation is liable.

"6. If the jury find that the treasurer of the corporation by his acts ratified the acts of the other servants and agents of the corporation in the furnishing of the materials for the publication of the libel, such ratification is the ratification of the corporation, and the corporation is liable, and the circulation of the libel after it was printed would be in law evidence of such ratification."

The judge declined to give the instructions requested, but, among other things, instructed the jury as follows:

" What is meant by publication ?   The word in its legal sense is not identical in signification with the meaning of that word as popularly and commonly used.   A publication in a legal sense is simply the communication of the defamatory matter to some third person. . . .

" Now in this case there is evidence that a large number of copies of a newspaper, printed and published in the town of Maynard, contained the report of the investigating committee, the matter upon which the plaintiffs rely in support of this action, and there is no dispute that a certain number of copies of this paper came into the possession of agents and servants of the defendant corporation, and were for a time in the place of business of the defendant corporation ; that of itself would not be a publication on the part of the servants or agents of the defendant corporation, or on the part of the corporation itself. . . .

" A corporation is liable in damages for the publication of a libel, as it is for its other torts; but to establish its liability, the publication must be shown to have been made by its authority, or to have been ratified by it, or to have been made by one of its servants or agents in the course of the business in which he was employed.

" To prove publication, some one of the three things to which I have called your attention must be proved.

" Now, upon all the evidence in the case, I think it my duty to instruct you, as matter of law, — and I do give you that instruction, — that there is no evidence of any publication made by the authority of the defendant corporation, or that any publication of the alleged libel was ratified by it. When I say ' made by the authority of a corporation,' I may illustrate my meaning.   Suppose the directors of the corporation, having charge of its affairs, at a meeting passed a vote authorizing and directing the publication of this article, and the circulation of it; that would be a publication by the authority of the corporation, — or if there had been a publication made, the directors, acting in behalf of the corporation, and practically constituting for the time being the corporation, might ratify the publication ; but I think, upon all the evidence in the case,

there is nothing which will justify you in finding a publication by authority of the defendant corporation, or the ratification by the corporation of a publication of this libel. Nor is it necessary that either of these two things should appear to enable the plaintiffs to maintain this action, because the corporation of necessity must act by agents and servants, and the corporation may be charged with publication if those agents or servants in the course of their employment, and within the apparent scope of their authority, publish the libel; and if they publish the libel in the course of their employment, and because of their employment, intending, it may be, to promote the interests of the employer, the defendant corporation, the corporation is chargeable with those acts, and there is the same liability there would be if the corporation, by vote of the directors, authorized the publication of this libel. Or, in other words, stating it briefly, as I did at first, if it appears that the publication was made by one of its servants or agents in the course of the business in which he was employed, that is enough to subject the corporation to liability. . . .

" There is evidence tending to show that a certain number of copies of the alleged libel came into the possession of Mr. Turner, and there is evidence, which is not controverted, showing that either Mr. Turner or Mr. Foran delivered or sent certain copies of the paper containing the alleged libel to three or four different persons. . . .

" Now the question to which I wish to direct your attention at present is whether, upon the evidence, you find that Turner and Foran, in putting these copies in circulation, in giving them to the persons I have named, were or were not at the time acting as the agents and servants of the corporation in the course of the business in which they were employed. Of course it might be true that Mr. Turner might publish a libel, meaning by that communicating the defamatory matter to a third person under such circumstances that the corporation of which he was treasurer and general manager would be in no way affected. Mr. Turner might be liable himself, but his employer would not be liable. . . .

" Now suppose Mr. Turner had felt some interest in that matter, and suppose Mr. Turner, having a copy of the paper con-

taining the libellous article, had given that paper to a friend of his, or sent it to any person by mail, that would be a publication undoubtedly of that libel, for which Mr. Turner might be liable; but nobody would claim upon these facts only, nothing further appearing, that the corporation in whose employ Mr. Turner was — the George F. Blake Manufacturing Company — would be subjected to any liability whatever. Other facts might appear of such a character that it would be competent for the jury to find that in giving or sending that paper he was acting in the course of his employment, and within the apparent scope of his authority, so as to charge his employer with liability; but if nothing appeared other than what I have assumed to be true in stating the case by way of illustration, the employer would not be liable.

" Now you will consider what the relation was that Turner and Foran sustained to the defendant corporation. You will consider the relation, so far as the evidence shows it, between this corporation because of the business it carried on, and the plaintiffs because of the business in which they were engaged. You will inquire whether Mr. Turner, whether Mr. Foran, put in circulation copies of that paper, thinking that in some way, directly or indirectly, it might benefit the corporation in whose employ they were. In other words, it all comes back to this, — and I do not much aid you by stating anything more, — you will determine, upon all the evidence in the case, whether the publication was made by the servants or agents of the defendant corporation in the course of the business in which they were employed. And if you say, the burden being upon the plaintiffs to prove that fact, that they were put in circulation by the servants or agents of the defendant corporation while acting in the course of the business in which they were employed, that is sufficient to charge the defendant corporation with liability. . . . If you find that a publication was made by Turner and by Foran, or by one or the other, but made, not in the course of their employment, but as individuals, on their own account, without regard to employment by the defendant corporation, there is no case as against the corporation. The suit should be brought against Mr. Turner personally, or against Mr. Foran personally. On the other hand, if the report is a libel upon

the plaintiffs, and was published by the defendant, the plaintiffs are entitled to a verdict, unless the defendant proves something affirmatively which constitutes a defence.

" Now consider the defence upon the ground set up in the answer, — that the allegations contained in the alleged libel are true. The defendant must prove, in order to support this defence and to be entitled to a verdict, that all the defamatory charges are true. The justification must be as broad as the charge, and must justify the precise charge made in the printed paper. But if the libel, as in this case, contains distinct and separate imputations against the plaintiffs, each being severable from the rest, so as to be intelligible by itself, and the defendant has proved the truth of one of such distinct charges, such proof will be a defence as to that charge, and the plaintiffs can have no damages by reason of its publication unless they prove that it was published with malicious intention. . . .

" If the defendant, in reference to any one of these distinct charges, has proved the truth of the charge as made, and there is no evidence that the defendant's servants in making the publication had a malicious intent, then the defendant, as to that particular charge, has shown a defence, and you will not take it into consideration if you come to the question of damages. Taking, however, the whole publication, it is my duty to say to you that the defendants have not justified the publication of the alleged libel, because, as to several of the charges which you may find to be defamatory and to be libellous concerning the plaintiffs, there is no attempt to prove their truth. . . .

" There are two publications in this case, as to which I think it is my duty to say that the occasions were not such as to constitute those publications privileged communications upon uncontroverted testimony in the case. The giving of a paper to Hall, the giving of a paper to Fiske, would not be privileged communications to Hall and Fiske; and you may take that as an instruction in matter of law, and leave those for the time being out of consideration. But the defendant says that as to two other publications, — namely, the publication to Berry, and the publication by sending a copy by Moore to the cashier of the Blackstone National Bank, the latter of which was forwarded to Peoria, and came into the hands of Bergen, and was shown by Bergen

to some of his associates upon the city committee, — that these communications were privileged communications, and that this action cannot be maintained for those publications, unless the plaintiffs satisfy you that those publications were made with actual malice. . . . Now in regard to the copy of the paper which went to Peoria, I give you an instruction as requested by the defendant, and it is to this effect.   If the jury find that Mr. Bergen was a member of the city government of Peoria, and of its water works committee, and an officer of the Peoria Bank, and that the Blackstone Bank was the Boston correspondent of said bank, and that said Bergen, through said Peoria Bank, addressed to said Blackstone Bank an inquiry as to the plaintiffs and their standing, and if the jury find that thereupon a copy of the libel was sent by the defendant in good faith, and in the belief that it was true, to said Blackstone Bank, in honest response to inquiry of it by said bank as to the plaintiffs and their standing, and that thereafter said Blackstone Bank forwarded said copy to said Peoria Bank, and that through the latter bank the said copy was communicated to a member or members of said committee by the hand of said Bergen, then the publication of that copy by the defendant under those circumstances was privileged, and, even if it resulted in the loss of the Peoria contract by the plaintiffs, still they cannot recover anything from the defendant on account thereof, and of said publication, unless the jury further find that said publication was made by defendant with actual malice. . . . If you find, and only if you find, that the facts are as assumed in this statement, will the publication be a privileged communication.

"And as to the copy given to Berry, I give you this instruction. . . . If the defendant gave a copy of the libel to Berry, there having been no previous publication by the defendant, and Berry in procuring such copy acted as the agent of the plaintiffs, and at their request, and such publication was procured with the view to bringing action, the publication was privileged. . . . If you find that Berry, although he thought procuring such a copy might aid the plaintiffs, did it of his own motion, then the giving of a copy to Berry would not be a privileged communication, unless certain other facts appear. . . . If you find that application was made by Berry to Foran for information in

regard to the standing of Howland and Ellis, and Berry said to Foran that it was a matter in which he was interested, then Foran would have the right, in response to that inquiry, to give a copy of the paper to Berry, assuming, and always assuming, that Foran himself acted in good faith, honestly believing that the charges contained in the printed paper were true in fact.

" Now you must determine what the facts are in regard to the publication to Berry, and then, keeping in mind the rules I have given you, will say whether or not the publication to Berry was privileged, and you will say whether or not the publication by Turner, sending a copy to the cashier of the Blackstone Bank, which was forwarded to Peoria, was in fact a privileged communication.

" But there is something more of great importance to be considered in regard to this ground of defence. If there was actual malice, that destroys the privilege. If you find that the occasion when the publications were made was such as to constitute it *prima facie* a privileged communication, still if you are not satisfied that Turner or Foran acted in good faith, believing that the charges contained in the printed matter were true, the publication would not be privileged. And further, the publication would not be privileged if, upon all the evidence in the case, you are satisfied that the publications were made with actual malice. . . . Malice may consist in a direct intention to injure another, or in a reckless disregard of his rights and of the consequences that may result to him. The jury may draw the inference of malice not only from extrinsic facts, as, for instance, from proof that the defendant knew the charges to be false, or had no reason to believe them to be true, but also from the terms in which the communication is made. If the jury find that the language in the printed paper is intemperate and extravagant, and that it manifestly exceeds the just limits necessary and proper in order to answer any inquiry which had been made by any person interested, this circumstance would tend to show malice. And as bearing upon the question whether the publication to Berry and the cashier of the Blackstone Bank were privileged, you may well consider the fact that the printed paper contains what the plaintiffs claim is defamatory matter in regard to the negotiations and dealings between

the plaintiffs and the defendant corporation.  Did Mr. Turner believe that those statements in regard to the negotiations between the plaintiffs and his corporation were true?  If he had no belief about it, did he act recklessly, knowing, if you find he did know, that such a charge was contained in the paper, in putting that paper into circulation?  And the same inquiries may be made in regard to the paper put in circulation by Foran.  If Foran did not act in good faith, honestly believing that the charges contained in the printed paper were true, the publication by him was not privileged.  It was not privileged if there was any malice in fact, — a desire to injure Howland and Ellis possibly, because by injuring Howland and Ellis some advantage might result to the defendant.  And what I say about the publication by Foran applies as well to the publication by Turner, by giving a copy of the paper, or sending a copy of the paper, through the Blackstone Bank to Peoria.

"If the printed paper is a libel upon the plaintiffs as a firm, and it was published by the defendant, and as to some or all of the defamatory matter the defendant has established no defence, either on the ground that the charges are true, or that the publication was privileged, the plaintiffs are entitled to a verdict."

The jury returned a verdict for the defendant; and the plaintiffs alleged exceptions.

*E. Avery & H. L. Baker,* for the plaintiffs.

*C. W. Bartlett & E. R. Anderson,* for the defendant.

KNOWLTON, J.  1. The first contention of the plaintiffs is that the answer is insufficient to authorize the introduction of evidence of the truth of the various allegations contained in the alleged libel.  It is argued that the answer, taken in connection with the declaration, does not definitely show what the defendant intends to prove in justification.  If the plaintiffs had had difficulty in knowing for what to prepare under this answer, they might have moved for a more specific statement, and it would have been in the power of the court to make such an order as would amply protect their rights.  In the absence of such a motion, the defendant could properly assume that evidence would be received tending to prove the truth of any

statements made in the alleged libel, and it would have been unfair to the defendant to exclude its evidence on an objection first interposed at the trial. *McLaughlin* v. *Cowley*, 127 Mass. 316.

2. The defendant introduced evidence tending to show that the plaintiffs failed to perform their contract with the town of Maynard, and that they supplied and endeavored to supply work and materials inferior to those called for by their agreement. The plaintiffs then offered evidence of their business reputation and of their individual reputation before they entered into the contract.

There has been a great variety of opinion on the question how far a plaintiff may introduce evidence of his good reputation in an action of slander. In general, it is held that such evidence is incompetent, unless his reputation is first attacked by the defendant; for he is presumed to be of good character until something appears to show the contrary. But if there is testimony against his reputation, he may meet the attack by calling witnesses to show his good character. In this Commonwealth, and in most jurisdictions, a defendant may prove, if he can, that the plaintiff is of bad reputation, in mitigation of damages, and rebutting testimony of a similar kind is competent on the same question. Ordinarily, evidence of the plaintiff's reputation is admissible only on the question of damages; but there are authorities which hold that, in a certain class of cases, it is competent on the question of liability. If the commission of a crime is charged in the libel, and the defendant offers evidence of the truth of the charge, it is sometimes said that the plaintiff may show his previous good reputation in answer to the evidence of his guilt. This is the familiar rule in criminal trials, but courts have differed on the question whether it should be introduced in suits for libel or slander. In New York, it is held that it should be confined to criminal prosecutions. *Houghtaling* v. *Kilderhouse*, 1 Comst. 530, and 2 Barb. 149, and cases cited. See also *Gough* v. *St. John*, 16 Wend. 646, 653; *Pratt* v. *Andrews*, 4 Comst. 493; *Miles* v. *Vanhorn*, 17 Ind. 245; *Cornwall* v. *Richardson*, Ry. & Mood. 305; Odgers, Libel and Slander, 298, note. In *Downey* v. *Dillon*, 52 Ind. 442, the court makes a distinction between cases in which the charge sought to be

proved is of the commission of a crime, and those in which the charge is of smaller magnitude, holding that in the former a plaintiff may show his good reputation in answer to evidence of the truth of the charge, and that in the latter he cannot.    We are aware of no well considered cases which go further than that. It is true that the plaintiff's reputation is in issue in an action of libel or slander, and when it is attacked it may be defended for the purpose of obtaining a proper award of damages.    But on principle as well as authority, evidence of good reputation is not competent to show that a plaintiff is not guilty of a dishonorable or unlawful act, which is not punishable as a crime, any more than evidence of his bad reputation would be competent to prove his guilt.    This kind of evidence has usually been strictly confined to criminal prosecutions, and it has never been admitted in reference to matters which are not subjects of criminal prosecution.    It has sometimes been admitted in suits for malicious prosecution, where from the nature of the action the plaintiff has the burden of disproving in a civil suit charges which in a preliminary proceeding have been made against him in a criminal prosecution.    *McIntire* v. *Levering*, 148 Mass. 546, and cases cited.

In *Harding* v. *Brooks*, 5 Pick. 244, which was an action of slander, the verdict was for the plaintiff, and the question was whether he was rightly permitted to introduce evidence of his good character after it had been attacked by an attempt to prove the truth of the slanderous words.    The adjudication was plainly right, for the evidence was competent on the question of damages, and, assuming, as the court seems to have done, that the charge imputed acts punishable criminally, it was within the principle that in such a trial good reputation may be shown in answer to specific facts indicating guilt.    We think this case should not be considered an authority for the introduction by a plaintiff of evidence of his good character in reply to evidence of the truth of a libel, except upon the question of damages, and in cases where the charge sought to be proved is of a criminal act.

In the present case the evidence was immaterial on the question of damages, for the verdict was for the defendant; and it was not competent for the purpose of disproving the truth of the

charges, for it did not meet the issue, and the charges were not of punishable conduct. It was therefore rightly excluded.

3. The first five of the plaintiff's requests for instructions relate to the alleged participation of the defendant in the preparation of the libel. These instructions were rightly refused. Each of the first three embodied as requisite to the existence of liability a publication of the libel by the defendant after it was printed, and the presiding justice gave full and proper instructions as to what would constitute a publication, and covered this part of the requests. The further proposition that furnishing any part of the materials used in the composition of the libel, or being concerned or in any way aiding in the production of the libel, would make the defendant liable for the libel in the form in which it appeared, is incorrect. The ruling requested went far enough to make the defendant liable for the publication, even if ignorant of the greater part of its contents, and if it had no intention that such a libel should be published, and gave no authority in regard to it.

4. The sixth request was properly refused, because it assumed that furnishing some of the materials used by the committee of the town in the preparation of the libel would constitute a publication of it as printed, when in fact the libel as a whole was something very different from the materials furnished by the defendant's employees, used in the preparation of a part of it.

5. The instructions given in regard to the liability of the corporation for the acts of its servants and agents, were correct and sufficient.

6. The jury were instructed that, "if the defendant gave a copy of the libel to Berry, there having been no previous publication by the defendant, and Berry in procuring such copy acted as the agent of the plaintiffs, and at their request, and such publication was procured with the view to bringing action, the publication was privileged." This was in accordance with views expressed by English judges, and was sound in principle. *Rogers* v. *Clifton*, 3 Bos. & P. 587, 592. *Duke of Brunswick* v. *Harmer*, 14 Q. B. 185. *King* v. *Waring*, 5 Esp. 13. *Smith* v. *Wood*, 3 Camp. 323. Odgers, Libel and Slander, 229. If the defendant is guilty of no wrong against the plaintiff except a wrong invited and procured by the plaintiff for the purpose of

making it the foundation of an action, it would be most unjust that the procurer of the wrongful act should be permitted to profit by it.   The jury may well have found that, if there was a publication by the defendant to Berry, there was no previous publication, because in what they did previously Foran and Turner were acting on their own account, and not for the corporation.

7. The instruction as to privilege in reference to the publication by Turner to Adams was as follows: " If the jury find that Mr. Bergen was a member of the city government of Peoria and of its water works committee, and an officer of the Peoria Bank, and that the Blackstone Bank was the Boston correspondent of said bank, and that said Bergen, through said Peoria Bank, addressed to said Blackstone Bank an inquiry as to the plaintiffs and their standing, and if the jury find that thereupon a copy of the libel was sent by the defendant in good faith, and in the belief that it was true, to said Blackstone Bank, in honest response to inquiry of it by said bank as to the plaintiffs and their standing, and that thereafter said Blackstone Bank forwarded said copy to said Peoria Bank, and that through the latter bank the said copy was communicated to a member or members of said committee by the hand of said Bergen, then the publication of that copy by defendant under those circumstances was privileged," etc.   There was evidence from which the jury might have found all the facts assumed in the instructions as necessary to justify the defendant on the ground of privilege.   The jury may have found that Turner, representing the defendant, acted in good faith, and in the belief that the libel was true.   It does not appear that he had knowledge of the facts referred to in the libel, except possibly those relating to his own corporation, and even these were largely transactions in which he had no personal part.   The publication was an official report, unanimously made by a committee of a town, who might be presumed to have acted carefully in their investigations, and it had been adopted by the town itself.   He well might give great credit to it without personally examining all the matters stated in it.   Moreover, on his testimony, the jury may have found that no errors of statement in regard to the plaintiffs' dealings with the defendant corporation had come to

his attention; for there was evidence that these statements varied but little from the literal truth, and he testified that he first saw the publication on Saturday, March 9, in the hands of Foran, and that Foran afterwards came to his desk and read it to him, and that he was indorsing checks at the time, and that he sent the paper to Adams at the Blackstone National Bank on the following Monday. The jury might have thought he was so occupied while the paper was being read that he did not attend very carefully to its contents, and that he did not read it himself before sending it to the bank. There was much other evidence bearing on the question of his good faith, such as the fact that this paper and that handed to Hall, one of his employees, were the only copies that ever passed from his hands, or that he ever exhibited.

8. It was proper for the jury to determine the facts on which the question of privilege depended. When the facts are determined, it is for the court to say, as matter of law, whether a privileged occasion is shown. On conflicting and uncertain evidence it is proper to instruct the jury in regard to what constitutes a privilege, and leave them to say, on the evidence, whether the essential facts are proved.

We have considered the principal exceptions argued in behalf of the plaintiffs. There were many other requests for instructions which it is not necessary to discuss in detail. The case was submitted to the jury under full instructions, which clearly and carefully stated the questions to be considered, and the law applicable to all parts of the case.

*Exceptions overruled.*