## PRIVILEGED STATEMENTS BY ATTORNEY IN ARGUMENT.

Common Pleas Court of Franklin County.

SAMUEL R. SOUTHARD V. INGLE A. MORRIS.

Decided, June, 1913.

*Slander—Action for Damages Against an Attorney—Based on State-
ments Made During Argument in Court—Question of Privilege a
Legal One for the Court to Decide, When—Direct and Forcible
Speech Permitted—Leniency and Liberalty in Deciding Whether
the Circumstances Warranted the Language Used.*

Where an attorney is charged with uttering slander in an argument
made before a jury, and there is no dispute as to the facts upon
which his comments were based, and it appears that in the light
of said facts he had some warrant for the statements which he
made, the case presented is not one for the jury to determine
whether the statements so made were warrantd in view of the
facts presented, but the court will hold that they were privileged,
and that no cause of action exists against the attorney because of
slander in commenting upon the facts as he did.

*H. C. Moore* and *O. E. Halterman*, for plaintiff.
*Ingle A. Morris* and *M. L. Bigger*, contra.

KINKEAD, J.

At the close of plaintiff's evidence a motion is interposed by
defendant to direct a verdict in favor of the defendant.

This action is brought against the defendant for alleged slan-
der claimed to have been spoken by the defendant of and con-
cerning the plaintiff.

There are three utterances charged against the defendant.

First, it is claimed that defendant spoke the following slan-
derous words:

"He (referring to plaintiff) wrote the word 'horseshoer' in
Exhibit A, himself, after this action (referring to *Southard
Novelty Co.* v. *Paul*, Court of Common Pleas, Franklin County,
Ohio) was begun and by so doing committed forgery."

The second charge is that on the 19th day of April, 1911, the defendant in the same discourse spoke the following:

"We had the Bohemian oats man; we later had the lightning rod swindler; and now we have the calendar swindlers," referring to and intending this plaintiff.

The third charge states that on the same date and in the same discourse defendant spoke of and concerning the plaintiff the following words:

"Exhibits B and C (referring to factory ticket and a stock order) were made up after this suit (*The Southard Novelty Co.* v. *Paul*) was started and for the purpose of being given as evidence in this trial. (*The Southard Novelty Co.* v. *Paul.*)"

Defendant intended and meant by this language to charge plaintiff with perjury or subornation of perjury.

The fourth charge avers that on the same date, referring to a transaction between the Southard Novelty Company, spoke the following: "Mr. Paul thought he was dealing with honest men."

That defendant thereby intended to convey the meaning that this plaintiff in the conduct of his business as general manager of the Southard Novelty Company was dishonest and could not be trusted in the ordinary business dealings between the said company and the customers of said company.

It is claimed that all these words were spoken in the presence of a number of persons. Plaintiff asks recovery of $25,000.

The defendant, by his answer, denies all the several allegations of plaintiff's amended petition, commencing at the second paragraph thereof, and continuing to the end of the petition.

Further answering, the defendant says that when the *alleged* words were *claimed* to have been spoken he was an attorney at law, and as such attorney and counsellor at law, was engaged in defending the said E. T. Paul mentioned in plaintiff's petition in the action therein referred to, filed by the Southard Novelty Company against E. T. Paul; that any and all words spoken by the defendant concerning said plaintiff herein, at the time men-

tioned, were spoken while said defendant was engaged as such attorney, and in the capacity of attorney and not otherwise.

In other words, the defendant claims that all that he may have said ·concerning the matters charged in the petition were spoken in his argument, and that therefore it was privileged and not actionable.

The plaintiff by reply denies the allegations in the answer.

The complaint contained in the petition is aimed at a valuable right of parties litigant. The importance of the question involved is due to this fact rather than to the rights of an attorney.

It is a most valuable right to be represented by learned and eloquent counsel before the court upon the law and before the jury as to facts. Even the court. may not by its act place unreasonable limitations or restrictions upon the right. The law therefore protects counsel in the largest and most liberal freedom of speech and allows considerable latitude, yet, as the privilege may be abused in various ways, courts may and should prescribe certain limitations.

The range of discussion is wide. In his discussion to the jury, it is the privilege of counsel to freely discuss the facts, to arraign the conduct of parties; impugn, excuse, justify or condemn motives so far as they are developed by the evidence; assail the credibility of witnesses, when it is impeached by direct evidence, or by the inconsistency or incoherence of their testimony. His illustrations may be as various as the resources of his genius; his argument as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wings of imagination. His manner must be decorous. No court can command from an enlightened public that respect necessary to an efficient administration of the law,. without maintaining in its business proceedings, that courtesy, dignity, and purity, which characterizes the intercourse of gentlemen in private life.

It is essential that all that can be said for each party should be heard. It is the duty of counsel to make the most of the case which his client is able to give .him. But he must not travel out of his client's cause. Illustrations, analogies, inferences

from facts proved, and in some instances, from failure to intro-
duce proof when it appears reasonable, are legitimate subjects of
comment and argument.   Courts should not be severe in ar-
resting such argument, on the ground that, to their minds, the
analogy or inference is forced or unnatural, or that the argu-
ment is illogical.

These expressions drawn from decisions serve to illustrate the
importance, scope and extent and right of argument.   And coun-
sel should not be called to account in actions like this unless it
appears that the privilege has been clearly abused.

The evidence shows that the alleged slanderous words, if they
were spoken, were spoken by the defendant in an argument to
the jury in the case of the Southard Novelty Co. against Edward
T. Paul tried in this court.   That was an action in which it was
sought to recover the sum of $65 on an account for making
calendars.   The answer in that case averred that the parties
entered into a written contract by which it was agreed that the
Southard Novelty Company were to make and deliver to Paul
a certain design of calendar containing the advertisement of
Paul, it being averred that plaintiff agreed to sell the same de-
sign to no other person.   It is then alleged that plaintiff did
not fulfill and perform the contract, but did sell the same to
some other person.   The plaintiff by reply denies the claim
that it agreed to sell to no other person.   The plaintiff's cause
of action in that case was founded upon contract, the terms and
conditions of which were drawn in dispute by the answer and
reply.

The evidence offered in that case was taken down by a stenog-
rapher and has been read in this case, and the exhibits ad-
mitted in evidence in that case have been introduced in evidence
in this case.

The facts and circumstances under which the alleged slander-
ous words are claimed to have been spoken are, therefore, not in
controversy, they are undisputed.

It appears therefrom that the original order taken from Paul
by a salesman of the Southard Novelty Co., W. L. Dawson, signed
by Paul and Dawson, contained the provision that the calendars

were to be sold "to no other person in city or contract void." A duplicate of this order was left with Paul. The original was delivered by Dawson to the Southard Novelty Company, and was subject to the approval of the company. There was testimony that the officer of the company, S. R. Southard, president, failed to approve the order because of this limitation, and that the salesman was directed to take the order back to Paul with the information that it could not be approved with the restriction in it. There is evidence by Southard that Dawson took the contract away—supposedly to Paul—and when it was returned it had the word "horseshoer" interlined so that it read: "Sell to no other horseshoer in city, or contract void." Mr. Southard, plaintiff here, testified that when Dawson brought the contract back it had the word "horseshoer" interlined, and that the interlineation was in the handwriting of Dawson, and that the order was thereupon approved.

The original order was dated February 8, 1908. It is stamped approved February 8, 1908. But in the place where the approval was signed it reads: "Approved at Columbus, Ohio, 3-8 '08, Thos. C. Southard."

There was testimony that after the order was returned by Dawson, the lady stenographer made out an "acknowledgment of order" and stock order in duplicate, and an envelope, which had written on the same the statement: "This design to be sold to no other horseshoer in Columbus." This is not an exact copy of the original contract signed by Paul.

The stenographer testified that she placed the acknowledgment in an envelope addressed to Paul, and placed it in a private mail box in their office. There was no testimony that it was placed in a U. S. mail box. Paul testified that he did not receive the acknowledgment with the word "horseshoer" in it.

The question who put that word horseshoer in the original contract signed by Paul, and whether the contract with this interlineation in it had ever been presented to Paul, and whether it was assented to by him, or whether a revised or changed copy with the word horseshoer in it was mailed to him and he acquiesced in it, was a vital question in the case, upon which its proper decision rested.

The testimony of Mr. Southard that he would not approve the contract with this limitation in it, because they had another outstanding contract for the same calendar, and that Dawson was instructed to take it back to Paul is self-serving and of no probity.

The fact that Dawson was not presented as a witness was a matter upon which counsel for Paul had the right to comment upon. There was some testimony of an uncertain character that could not be gotten, or that he might be dead. Miss Voeller stated that she last heard from him in Detroit, which was two years before that time.

Under this state of evidence counsel for Paul had the right to draw in question the probity of the testimony of S. R. Southard; he had the right and may have been justified in contending that he was not dealing honestly or that he was tricky, or even in contending that he or any one of the persons in charge had inserted the word ''horseshoer'' in the original contract; he had the right to contend that if it was inserted in it without the consent or knowledge of Paul; that it was· a forgery, for an alteration by any one under such circumstances would be a forgery. He had the right also to contend that it might have been done even after the action was brought. He had the right to insist that if his client had stated that he never had known of the interlineation, that his client's statement was the true statement, and that Southard's statement was false. After all it was one statement against another, because the testimony of the stenographer does not go to the point. And Southard knew nothing about it except what he learned from Dawson. There was much to back up Mr. Morris in his claim if he stated the things charged to have been stated by him, because under all the circumstances I would agree with the conclusion of Judge Dillon that there was no proof of a contract.

The references as to the ''Bohemian oats man,'' the ''lightning rod man,'' and the ''calendar'' swindler was a comparison of methods in reference to signing contracts. The circumstances warranted making such comparisons, because here was an instance where the party signed one contract, and when it was

offered against him there was an interlineation in it which he denied assenting to, with absolutely no testimony directly contradicting him. There was no evidence that the acceptance was even deposited in the mails.

Even if it was, there is much doubt whether that method would have been effective. There is no proof as stated that the change was assented to by Paul, and hence there was no contract. These inferences are so clearly relevant and pertinent that there does not seem much room for argument.

The facts and circumstances under which the words are alleged to have been spoken are not in dispute. And the rule in such case is that the question of privilege is a legal one for the court to determine—whether the occasion is such as to bring the alleged defamatory publication within the protection afforded to privileged communications. 25 Cyc., 547.

There is only one question involved in this case which calls for any special discrimination from the general doctrine. It is whether the court must decide that the statements claimed to have been made in argument by counsel were pertinent and relevant.

The general doctrine as to privilege is stated in *Mauk* v. *Brundage,* 68 O. S., 89, to be that:

"Whether or not the occasion gives the privilege is a question of law for the court, for unless there is a privileged occasion, the publication of defamatory matter is legally malicious, it being a case of a wrongful act intentionally done without just cause or excuse; that is, in the absence of a justifiable occasion for the publication, malice is but an inference of law, and should be left as a question of fact for the jury."

But the precise question here goes farther and depends not so much upon the occasion as upon the extent, character, relevancy and pertinency of the expressions.

It is well understood that arguments of counsel in civil trials are privileged under certain conditions and under proper limitations. The reasons for such a privilege are familiar, but may be stated in this connection.

If counsel, parties and witnesses could be held responsible for the injurious effects of statements made by them, few could be

persuaded to undertake the offices of justice, and none save the reckless would tempt the perils of such courts for redress. A counsel's position is one of great difficulty, and he has special need to have his mind clear of all anxiety. A wide latitude is justly and necessarily given him in order to insure a full hearing and the doing of justice. It would be impossible for him to do his duty if he could be questioned for the strength of his expression or the exaggeration of his arguments, deductions or inferences. That they are extreme, or only specious or colorable, is not the test, but whether they are pertinent.'' *Kinkead, Torts,* 403; *Seckels* v. *Kling,* 31 Misc., 287; 64 N. Y. Supp., 252.

So the rule is that as long as the statements are reasonably pertinent and material or relevant to the issues, they are absolutely protected. *Holles* v. *Meux,* 69 Cal., 625 (58 Am. Rep., 574); *Hastings* v. *Lusk,* 22 Wend., 410 (34 Am. Dec., 330); *Lester* v. *Thurmond,* 51 Ga., 118; *Hoar* v. *Wood,* 3 Met., 193; *Maulsly* v. *Reifsnider,* 69 Md., 143; *Shelfer* v. *Gooding,* 47 N. C., 175. It follows, therefore, that if they are material, relevant or pertinent, under the facts and circumstances which are not in dispute the general doctrine of privilege already mentioned renders the question one of law for the court.

It is only a question for the jury where it is a qualified privilege and the facts and circumstances are in dispute. In such case the court gives the jury the rule of law, and the jury in pursuance thereof determines the facts (25 Cyc., 547, and numerous cases cited). Examination was made of the following cases which support the rule: *Kersting* v. *White,* 107 Mo., 265; *Nebb* v. *Hope,* 116 Pa. St., 145; *Wagner* v. *Scott,* 164 Mo., 289.

The case of *Atlantic News Publishing Co.* v. *Medlock,* 123 Ga., 714, is a particularly instructive case. It is pointed out that:

''The characteristic feature of absolute, as distinguished from conditional, privilege is that in the former the question of malice is not open; all inquiry into good faith is closed.

''In every case of conditional privilege, if the privilege is used as a cloak for venting private malice and not *bona fide* in promotion of the object for which the privilege is granted, the party defamed has a right of action.''

This case involved a complaint against a newspaper for publication of a speech by an attorney who had used language in argument charging one of the parties to an action of bribing witnesses.   The court held that:

"An attorney at law has a conditional privilege to make, during the progress of a trial, such fair comments on the circumstances of the case and the conduct of the parties in connection therewith as in his judgment seem proper."

The distinction between the liability of the attorney in addressing a jury, and the non-privileged words spoken in private conversation is stated to be that no action can be maintained against an attorney for words spoken to a jury without proof of actual malice.   If an attorney avails himself of his position as an advocate maliciously to slander another by using words wholly unjustifiable, then he would be liable to an action and not otherwise.   *Lester* v. *Thurmond*, 51 Ga., 118, 119.

While the authority from which the statement just made was drawn uses the term actual malice, I would suggest this modification.   If the privilege was abused there would be malice in law.

*Rudin* v. *Fauver,* 15 C.C. (N.S.), 30, recognizes the rule of absolute privilege where statements made by attorneys in court where they have *no such obvious* irrelevancy or utter want of relation to the action as to put them entirely out of the pale of privilege.

Judge Gorman, of Cincinnati, has stated the rule that the immunity of an attorney extends only to statements made in the course of proceedings which are pertinent to the case.   *Levy* v. *Littleford,* Vol. 6, Ohio Law Rep., 682.

Now the rule which we lay down in this decision—admitting for the purposes of the motion for direction of a verdict, that defendant may have made the statements charged, the facts and circumstances under which they were made not being in dispute; the issues in the case in which they are alleged to have been made, as well as the evidence offered in the case, being such as to raise the question of the validity of the contract involved, and to challenge the good faith, honesty and integrity of the plaintiff

as general manager of the Southard Novelty Company, as well as to whether he had anything to do with changing the written contract which was signed by the defendant in that case, and the alleged statements made by defendant being obviously relevant and pertinent thereto, and there being no such obvious irrelevancy or utter want of relation thereto—is that they were absolutely privileged, there was no malice, and the question is one of law for the court.

A cogent demonstration that the question is one for the court may be made by stating the rule that the issues in the case must be stated to the jury by the court; the relevancy and competency of the testimony must be passed upon by the court, and finally the scope and propriety of the argument of counsel to the jury must be decided by the court.

That being so, would it not therefore be entirely unreasonable to submit the question in a case like this to the jury for it to determine whether the attorney had abused his argument by making severe strictures, or exaggerated claims so long as they are deductions and inferences which may clearly have reference to the questions involved.

The rule of *Post Publishing Co.* v. *Maloney,* 50 O. S., 71, which counsel earnestly contends to be applicable, is wholly unlike this case. There the facts upon which it was claimed the privilege arose were pleaded in the answer, and were put in issue by the reply. The answer sets forth the facts and circumstances and the manner in which the matters published were collected and ascertained, and these were brought in dispute by the reply. It is, therefore, clearly apparent that the facts giving rise to the claimed privilege were to be ascertained by the jury, and the law as given by the court applied to them by the decision of the jury.

Because of the importance of this question and the earnestness of counsel presenting it, I have endeavored to give my reasons fully.

The motion will, therefore, be sustained and, gentlemen of the jury, you will select one of your number as foreman, sitting where you are, and have your foreman sign a verdict in favor

of the defendant by the direction of the court.    (Exception by the plaintiff.)

### DECISION ON MOTION FOR A NEW TRIAL.

Upon motion for new trial counsel for plaintiff urges with much sincerity of argument that the court in directing verdict in favor of the defendant usurped the function of the jury; that it is difficult under the evidence to determine whether counsel was privileged to make the statements charged or to determine whether he exceeded his privilege, and whether such alleged excess of statement should go to the jury. Counsel asks how the court can determine whether, under the evidence counsel had motives of malice, or that the words were used with a reckless disregard of the rights of the plaintiff without weighing the evidence. It is urged that the court in passing upon the motion to direct a verdict weighed evidence of vital importance to plaintiff.

Whether the direction of a verdict was proper must depend upon the facts. The theory upon which the action was taken was that the facts and circumstances under which the words are alleged to have been spoken were conceded or admitted. In other words, there was no controversy concerning the facts relating to the occasion, or as to the pleadings and the evidence in the case in which defendant made the argument where the words claimed to have been spoken. There was sharp conflict and controversy as to the ultimate facts in that case. But in this—slander case—there is no controversy as to the facts and circumstances under which the words were spoken.

The sole question is whether the words spoken had any pertinency or relevancy to the matters in controversy in that case, or whether they were in excess of right.

The position of the court was that the pleadings and evidence disclosed enough in the case to show that the words had some pertinency to the matters in dispute.

The view taken of the law was that in a case where an attorney is charged with slander in argument, and there is no

dispute as to what the pleadings and the evidence was, and there is sufficient showing on the face thereof to disclose that counsel had some warrant in making the statements, the court may well hold the case one of absolute privilege under the circumstances, even though other persons might be of the opinion that the deductions were not warranted by the whole evidence.

If there is no evidence to warrant any such statements of course there is no privilege; if the evidence as a whole warrants no such inferences there is no privilege.

Ordinarily where there is a question at issue, and the facts and circumstances though not in dispute are such that different minds might come to different conclusions, the same must be submitted to the jury. This rule is generally applied in negligence cases. It might be, and in fact it must be the basis of the claim of counsel here.

The court considered this point in directing the verdict, and concluded that it would be an unsafe and unjust rule to adopt in cases like this, where the court was of the opinion that the pleadings and the evidence were such as to give counsel some warrant for the inferences. If such a rule of practice were to be adopted in such cases and under such circumstances clients might be prejudiced, the cause of justice might be seriously affected, and the independence of the advocate destroyed. As stated in the original opinion the question of the scope and proper exercise of the right of argument in trials is within the exclusive control of the court. If it transcends the bounds of pertinency or relevancy, or exceeds the right, it is the province and the duty of the court to regulate and control it.

This conceded rule is an important factor in the province and duty of the court in a case of slander which calls in question the proper exercise of the right of argument. Suppose a case where an excess of the right of argument is called in question as is done here, where the particular matter was passed upon, and upon objection, the right was sustained by the court, although choice of language or expression be condemned. If we are to be governed by an ironclad rule that the relevancy or pertinency of argument is to be submitted to the jury, in an action like this,

though the court be of the opinion that it had some remote bearing, it would open the way for spiteful and revengeful litigants to call an adversary advocate to account, thus seriously interfering with the administration of justice.

Counsel asks how any case may ever go to a jury under the theory adopted by this court in directing the verdict. He contends that if the occasion is privileged, it is privileged absolutely for whatever the attorney may say; that there is no middle ground. Not at all.

If the argument is plainly impertinent and has no obvious relevancy, it is a qualified privilege and must go to the jury. Or where in any case there is conflict and dispute as to what the evidence was it is a qualified privilege for the jury.

If as held by one circuit court (15 C.C.(N.S.), 30) statements by an attorney have no such obvious irrelevancy or utter want of relation to the case as to put them entirely out of the pale of privilege, it is absolute.

The question for the court is then whether the court erred in deciding that the statements had an obvious relevancy or pertinency.

While the court gave the evidence careful consideration at the trial, having the stenographer read over certain portions, the earnest and intellectual sincerity of purpose of counsel quickens us to a careful re-examination of the evidence.

The nature of the cause is set forth in the original opinion directing a verdict. The issue was whether the parties made a contract which rendered the defendant liable for the account sued upon by the plaintiff. Paul claimed that the only contract made by him was one that provided that the Southard Novelty Company agreed to make for him a certain calendar and agreed to sell to no other person in the city.

The original order was dated February 8, 1908, and signed by "E. T. Paul, Buyer." "W. L. Dawson, Salesman." "Approved Thos. C. Southard. 3, 3, '08." It reads "Sell to no other horseshoer in city or contract void. 2, 12." "Ack. 3, Date 2, 12." "This order shall be a contract when approved by the company," etc.

The factory envelope, the "stock order," and "acknowledgment of order," contains the statement: "This design to be sold to no other horseshoer in Columbus, O."

The duplicate order signed by Paul and Dawson reads: "Sell to no other in city or contract void."

In the trial of this case Samuel R. Southard was offered as a witness, and after testifying at some length, and while undertaking to relate the testimony at the trial in which the alleged slander was spoken, causing controversy, the court suggested that inasmuch as the testimony in that trial was taken by a stenographer that counsel agree to have the stenographer called and give the testimony so there would be no argument or controversy, and this was agreed to (Record, pp. 8, 9, 10, 13):

"Clara Valler testified she was employed by the Southard Novelty Co.; that the last she knew of Dawson was in Detroit, Mich. (Record, p. 15); that she had not known anything about his whereabouts since then; she last knew of him a couple of years ago; she first saw the order when it was given over to her to make out a factory ticket, Mch. 3, 08; she supposed the bookkeeper handed it to her; she made out the factory ticket, the acknowledgment, and the stock order; she states that the acknowledgment which was produced was a copy, that she mailed the original to Paul; that she addressed the envelope that went to Paul, to his name and address in the city, and stamped, it and mailed it; that she made a notation on the order of the date she acknowledged it. She said she knew she mailed it because that was her custom, that was what she did with the rest."

On cross-examination (Rec., p. 18) she admitted that she put it in a box, or dropped it in a box for that purpose. That is she meant a box kept in the office for that purpose. She says the mailman collected the mail as he came in and out of the office.

She states that she made the acknowledgment from the original order (Rec., p. 20) as it came to her. (But it is to be noted that she did not make an exact copy of the important part of the order.)

She stated the envelope had a return card on it. The acknowledgment of order bears date February 12th, and she states that she acknowledged it, or mailed it ——— March 3, but in order

to make the date of the acknowledgment correspond with the date of the entry, she dated it back (Rec. pp. 22, 23).

She did not see the original order when it first came to the office; it was brought by Dawson (p. 23). The orders are turned over to one of the officers, she did not know who this was turned over to.

When asked about the original acknowledgment again on p. 27, she said there was nothing on the copy to indicate the date the copy was made.

"Q. When did you make that? A. Well, I don't know the date. I made it sometime the year following the date the order was taken, after the account was in dispute. I don't know the date.
"Q. What was the occasion of your making that up? A. Mr. Thomas Southard asked me if I could make a copy of the acknowledgment I sent to Mr. Paul?"

She made the copy of the acknowledgment introduced in evidence from the stock sheet which she claims also shows the carbon copy (Rec., p. 28). She says she might have testified before the justice's court that she didn't know whether she mailed it or not.

She states finally that Dawson is dead; that that was the last report she had.

S. R. Southard testified that he was treasurer and general manager.

Mr. Southard stated on cross-examination that he would not admit that Mr. Paul did not sign the contract with the word "horseshoer" in it (Rec., p. 32), and stated in the form of conclusion: "I know when the order was signed up the word 'horseshoer' was put there with his knowledge and consent." He admits that he was not there when it was signed, and that Dawson took the order. Asked as to Dawson, he stated that the last he heard of Dawson was a notice in the paper that he was dead, which was during the summer of 1909.

He states that the body of the order was written by Dawson. Asked as to whose handwriting the word "horseshoer" was in he answered: "Supposed to be the same" (Rec., p. 32).

Plaintiff rested.

E. T. Paul testified that the word "horseshoer" was not on the contract when he signed it (Rec., p. 32); that he did not find out that the contract was interlined until after the calendars were delivered, that he happened to run across the calendar at Balzer Bros. transfer line, along in January some time; he states he did not receive a notice from the company at any time prior to the delivery of the goods that the order was changed with the insertion of the word "horseshoer"; that he did not receive an acknowledgment of any kind, by mail or otherwise.

S. R. Southard was called for cross-examination and admitted that his company made the Balzer calendar and that they got the order in December, 1907, and completed it in 1908.

Paul was further examined and stated that he received no mail from Southard. Asked as to his testimony before the justice's court, he said Southard was to see him twice, some time in 1909, after the dispute arose. Questioned as to any conversation that he may have had with S. R. Southard as to the contract he said he didn't have any conversation about the word "horseshoer" being in the contract. He said he would look up the contract, did look it up and refused to show him his contract; that he did have a telephone conversation with Southard in which he stated he had looked in his safe at contract, and told him the word "horseshoer" was not in it.

S. R. Southard testified in rebuttal that he had visited Paul in April, 1909, and presented him a statement, and Paul said he didn't think he owed it; he asked him why, and he stated the conditions of the contract were not complied with; that his contract was different from "ours." He asked Paul if he had received an acknowledgment, and he replied that he may have received it. Southard says he told him what their contract was, and that Paul said; "Well your agent was back here and talked about that; we had quite an argument that; but I objected to his giving me exclusive in my line of business; but we had quite an argument about it."

Southard says that he afterwards had a conversation with Paul over the telephone, and told him that he had sent Dawson back to him in regard to the exclusiveness of the calendar, that he (Paul) stated that they had quite an argument about it.

Southard says he told Paul either at the time he saw him or over the telephone that he had given instructions to Mr. Dawson to take the order back to him and have the word ''horseshoer'' inserted in it. ''When he (Dawson) brought it back with the insertion in there the order was all right as far as we were concerned.''

''He had changed it? A. With Mr. Paul's consent, apparently.

''Q. How do you know? A. Because Mr. Paul admitted he had been there.''

This examination is very important. It is entirely apparent that Southard is putting it as favorably to his view as he can, and in the form of conclusion, endeavoring to show that Paul made admissions. But pinned down, Southard does not say that Paul consented to the change. (Record, p. 52.) He stated that the word ''horseshoer'' was apparently interlined by the same person who wrote the order.

''Q. Will you swear that was Mr. Dawson? (who wrote the word 'Horseshoer'). A. I will swear that was Mr. Dawson. It is supposed to have been written the day following the day the order was given.

''Q. Didn't you, Mr. Southard, interline that word,'' etc.? ''A. I did not; no sir.

''Q. Mr. Southard, I will ask you if you did not, after you had a conversation with Mr. Paul and had seen his copy of the contract—the yellow copy—go back to the office, and then you changed the order yourself—and called him on the 'phone? A. I never saw his contract. I testified he refused to show me his contract.''

He denied that he changed the contract.

Thos. Southard testified that the writing on the order was that of Dawson.

All that is important in the evidence has been extracted and set down here.

The following observation may be made from the evidence:

.1. A question is raised whether an acknowledgment of the order was ever made out and mailed. This comes about first

because the terms of the proposed contract were changed by *somebody*. All we have to go by as to how or why it was changed is the claim of S. R. Southard. Paul denies ever having received an acknowledgment. He would not be legally bound by it, if he did. Its terms and conditions were completely changed if it was in fact mailed. And he need pay no attention to it, because he had made a proposition, and if it was not accepted, that was the end of it.

Southard's effort to make it out that he had had a talk with Paul about the contract, in which he sought to give the impression that he had sent Dawson back to him to change the contract, is in my judgment entitled to little weight, except to cast suspicion against him concerning the change of Paul's testimony.

To receive an order signed by a customer with the provision in, "Sell to no other in the city" and send back and acknowledgment signed by no one, except the name, "The Southard Novelty Company" printed thereon, with the terms of the essential portion of the contract, and the language completely changed: "This design to be sold to no other horseshoer in .Columbus, O.," certainly does not make a contract even if it was mailed. It does not seem reasonable that a clerk would even change the form of language from the original with the interlined horseshoer, without permission or authority of the management.

The impressions which might be drawn from Mr. Southard's testimony in his effort to show that Paul's attention was called to the change are sufficient to give counsel the privilege of making the deductions as charged.

One might be warranted in drawing the inference that the copy of the written acknowledgment was made up for use in the trial because it was made up as the evidence shows, to represent the one alleged to have been mailed; and counsel in the heat of trial and without having an opportunity to carefully consider the matter and make comparisons, might honestly believe and argue that Exhibits B and C were made up after this action was started, because the resemblance at a glance is ap-

parent on the face.  But upon minute examination as the court has made on the motion for new trial, it is entirely clear that the copy of the acknowledgment was made at a different time from the two carbon copies, which bears out the claim of the plaintiff in some degree.

But under the circumstances, the court is of the opinion that a rule so stringent ought not to be applied to counsel in the heat of argument as would hold him responsible for an error in making the inference that all three of these exhibits were prepared after dispute arose and for use at trial.

The court after review of the testimony with care is more strong in the belief of the correctness of its conclusion in directing a verdict.

Southard stated that the interlineation was made by Dawson, but it is far from being satisfactory that it was done by any one honestly and squarely.  Southard's efforts to bolster up his claim, by relating what took place between himself and Paul, together with all the evidence makes pertinent the claim that: "He (Southard) wrote the word 'horseshoer' in Exhibit A, himself, after this action, and so forth, was begun, and by so doing committed forgery."  Counsel for Paul had the right to assume that his client's statement was true, he had the right to argue that Dawson did not write the word in, and he had the right to make the deduction that Southard was responsible, because Southard was the only witness in the trial who had undertaken to claim that Dawson did it, except Miss Valler expressed the opinion that it was in Dawson's handwriting.

The right of counsel is too obvious for further discussion although more reasons might be advanced.

Repeating what was stated in the original opinion, the court is more strongly impressed with the views expressed that all that is claimed to have been stated by counsel was so obviously relevant that there should be an absolute privilege under the circumstances.

These final conclusions will not be satisfactory to counsel, but the court has given the case more than ordinary attention because of the learned argument of counsel, orally and upon brief, and the importance of the questions.

The court has carefully reviewed and perhaps weighed the *undisputed* evidence for the purpose merely of ascertaining and determining whether the statements charged had any obvious relevancy to the issues. But that is not by any means indicative of usurpation by the court of the function of the jury. No stronger argument can be made in support of this position than that already mentioned that it is peculiarly the function or province of the court to decide the relevancy or pertinency of argument when complaint is made that it passes beyond the boundaries of right. This is acknowledgedly so during trial, and should be so in a case like this when the advocate is called to account. This fact or principle, as well as the fact that the scope and right of argument is determinable by the pleadings and evidence, is the chief mark of distinction between this case and those precedents dealing with the province of court or jury. The points of difference between this case and *Post Publishing Co.* v. *Malony*, 50 O. S., 71, and *Mauk* v. *Brundage*, 68 O. S., 89, are so obvious as to need no further elucidation. The general principle expressed in the latter case to the effect that "where the publication is claimed to be privileged the question whether or not the occasion gives the privilege, the controlling facts being conceded, is for the court," has been adopted and applied in this case.

The relevancy of the "landmark" case of *Hastings* v. *Lusk*, 22 Wendell, 410, and other decisions cited in the brief of counsel, and applicability to the facts and circumstances is not apparent.

There is no obscurity in the evidence in the case as to the conduct of counsel which warranted submission of the case to the jury.

While the greatest good may be derived from the traditions of the past as embodied in judicial precedent, and notwithstanding present day adverse criticism on all sides, it is the constant aim that law shall be applied to new cases involving new conditions in such way that it shall advance or progress in keeping with intelligent and enlightened thought, common sense and justice.

Hardly any case is presented to the historic court of common pleas which does not present new and variant facts and conditions. In such case it is the province of the legal profession and courts to meet the new demands and new conditions, drawing their inspiration from the wisdom found in the traditions of the past as well as from the scientific and humanitarian principles of the present. In the midst of the chastic, indiscriminate and sometimes unintelligent criticism, it would be well to recall the principle applied by courts in early Roman days, that whenever there was danger of the strict letter of the law doing violence to the cause of justice, common sense, reason and equity was applied and the letter of the law was disregarded. So has it ever since been when courts have not been limited by constitutional or statutory law. Centuries ago in England an act of Parliament was passed making it mandatory upon courts to disregard technicalities and immaterial errors in the interest of substantial justice. And such a provision has been a part of the law of this state for years.

Returning from the digression of moralism, the point urged by counsel for plaintiff is that the precedents all support the view that the question should have been submitted to the jury and counsel have produced landmark decisions in support of his claim.

As before stated, the only justification for submitting this case to the jury would be if it comes within the rule supported by what is said to be the weight of authority, where the inferences to be deduced may be differently drawn by fair minded men. *2 Thompson on Trials*, Section 2037 (Last Ed.), citing 29 Ky. Law Rep., 480; 50 O. S., 71; 116 N. Y., 20; 156 Mass., 543; 152 Pa. St., 406.

We distinguish this case from the rule of some of the precedents for reasons already stated.

It is not questioned that both in England and in this country counsel are accorded the right to speak with the most unrestrained freedom upon all subjects connected with the case, so long as they confine themselves to matters pertinent and material. The law justly and necessarily, in view of the importance

of the privilege, allows very great liberty, surrounding counsel with a complete shield except where the privilege has been plainly and palpably abused. (Valuable note 17 American Decisions, 194.)

Chief Justice Shaw thus clearly presented the matter:

"Then we take the rule to be well settled that words spoken in the course of judicial proceedings, though they impute crime to another, are not actionable if they are applicable and pertinent."

In determining what is pertinent, much latitude must be allowed to the judgment and discretion of counsel, and a much larger allowance made for the ardent and excited feelings with which counsel who naturally and necessarily identifies himself with his client, may become animated, by constantly regarding one side only of an interesting and animated controversy. And if these feelings sometimes manifest themselves in strong invectives or exaggerated expressions, beyond what the occasion would justify, it is to be recollected that the judge may be appealed to, if a jury case. There must be same restraint, and counsel must not be allowed to avail himself of his situation to gratify malice. Subject to this restriction, it is on the whole for the public interest, and best calculated to subserve the purpose of justice, to allow counsel freedom of speech; and this freedom of discussion ought not to be impaired by numerous and refined distinctions. 17 Am. Dec., 194, Note and cases.

"It is a matter of law for the court to determine whether the occasion of writing or speaking criminatory language, which would otherwise be actionable, repels the inference of malice, constituting what is called a privileged communication; and if there is no intrinsic evidence of malice, it is the duty of the court to direct a non-suit or verdict for the defendant. If the communication contains expressions which exceed the limits of privilege, such expressions are evidence of malice, and the case shall be given to the jury." *Neeb* v. *Hope,* 111 Pa. St., 145; *Jackson* v. *Pittsburg Times,* 152 Pa. St., 406.

We need to be content with the general doctrine announced in the *Mauk* v. *Brundage* case, applying it with reason to the facts which we have done.

The importance of the question as one of practice-and as affecting the administration of justice has seemed to justify the full consideration given it.

The motion for new trial is overruled, and the action dismissed.