JACOB STRYKER vs. STONE, TIMLOW AND COMPANY,
INCORPORATED.

SAME vs. ALBERT H. STONE.

Suffolk.    March 20, 1917. — May 26, 1917.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & PIERCE, JJ.

*Libel and Slander. Evidence. Witness,* Examination of adverse witness. *Damages,* In tort: from publication of libel. *Practice, Civil,* Ordering verdict, Exceptions.

In an action against a former employer of the plaintiff for an alleged libel published in certain newspapers and a trade journal charging the plaintiff with dishonest and disloyal use of trade secrets of his former employer, upon exceptions of the defendant relating to the admission and exclusion of evidence at the trial, it was *held* that, there being ample evidence to connect the defendant with the publication charged, the portions of the newspapers and of the trade journal containing the articles in question properly were admitted in evidence, the order of proof resting in the discretion of the presiding judge, that a conversation of the defendant with the publisher of one of the newspapers in question was admissible, at least to show that the defendant procured the publication in that paper, that certain letters of the defendant to one of the newspapers in question were admissible, and that certain evidence offered by the defendant was excluded properly as being immaterial or *res inter alios.*

In the same case, the defendant having been called by the plaintiff as a reluctant witness in the plaintiff's behalf, it was *held* that it could not be said that the discretionary power of the presiding judge in regulating the scope of what was virtually a cross-examination of the defendant was exercised improperly.

In the same case, there having been ample evidence of publication and of malice, it was held that the libellous character of the articles was to be determined by the jury by considering each article in its entirety.

In the same case, the presiding judge submitted to the jury a number of special questions, the answers of the jury to which were held by the court to establish all the essentials of liability, and it further was *held* that under these circumstances there was no error on the part of the judge in ordering the jury to return a general verdict for the plaintiff.

In the same case, upon a new trial solely upon the issue of damages, it was *held* that the defendant had no ground for exception to an instruction given to the jury at the request of the plaintiff, to the effect that the truth or falsity of the charge of disloyalty contained in the libellous articles should not be considered except as, upon the evidence properly in the case, such truth or falsity might affect the amount of damages to be awarded by reason of that charge.

Upon the trial of the same issue of damages the defendant contended that, as the

jury at the former trial had found that the plaintiff had broken his contract of employment by the defendant, he could not recover damages for loss of his earning capacity; but it was *held* that this contention was not correct, because the impairment of the plaintiff's earning capacity caused by the publication of the libel might be found to have extended beyond the period of the contract; and moreover, that the defendant's contention wrongly assumed that the plaintiff might have gone back to the defendant's employ after the publication of the libel, which was not found by the jury.

Upon the contention mentioned above the judge instructed the jury as follows: "If you find that contract was still open to him after the libel was published and he reasonably ought to have gone back to that employment after that time, then I am going to permit you to consider his failure to do that, . . . if that was still open to him then he cannot have damages assessed" and "unless you find he could have gone back you get to the question whether these publications did prevent him from obtaining employment during part or the whole of the time since." *Held,* that this instruction was sufficiently favorable to the defendant.

Upon the trial of the same issue of damages, the plaintiff excepted to the admission of evidence in regard to efforts of the plaintiff to get customers of the defendant for his new employer, who was the person named in the libel to whom the plaintiff was charged with having divulged wrongfully the defendant's trade secrets, and it was *held,* that, although this evidence appeared to be incompetent as being immaterial to the issue on trial, the error of admitting it did not affect injuriously the substantial rights of the plaintiff and that under St. 1913, c. 716, § 1, the exception should be overruled.

Upon another exception of the plaintiff taken at the trial of the same issue of damages, it was *held* that the judge rightly refused to rule as matter of law that the plaintiff could not have returned to his former work, the question whether he could have returned to the defendant's employ or not being one of fact for the jury.

TWO ACTIONS OF TORT for two libels alleged to have been published by the defendants of and concerning the plaintiff, the first action being against Stone, Timlow and Company, Incorporated, a corporation, and the second action being against Albert W. Stone, individually, who was the president of that corporation. Writs dated July 23, 1914.

The first count of the declaration was for the publication in the Medford Mercury of an alleged libel of which the copy annexed was marked A. The second count was for the publication in the Medford Messenger of an alleged libel of which the copy annexed was marked B. The third count was for the publication in the Shoe and Leather Reporter and in the Medford Messenger and the Medford Mercury of both the alleged libels marked A and B.

The alleged libels were as follows:

### A.

"Upheld by court.

"Medford leather companies win victory in case affecting trade secrets in Canada.

"A case of much interest to Medford people, showing the value and importance of trade secret agreements between employer and employes, has just been settled out of court. Stone, Timlow & Co., Inc., of Boston and West Medford, brought suit in the supreme court of Ontario in Toronto recently to restrain Clarke & Clarke, Ltd., and Jacob Stryker, by injunction, from making use of certain secret formulas, recipes, and methods of manufacturing and other trade secrets used by the corporation in the special beaming and preparation of hides and skins for tanning into Spanish and morocco furniture leathers by the Shenk-Adams Company, which is owned and controlled by Stone, Timlow & Co., Inc. This corporation has always taken the precaution to have every employe sign a trade secret agreement making it a condition of their employment not to use, sell, give away or make known, any of the corporation's trade secrets while in their employ or thereafter.

"Notwithstanding such a contract their principal man, Jacob Stryker, left them some months ago and went to Clarke & Clarke, Ltd., of Toronto and undertook to make the same Shenk-Adams leathers for this company by the same methods and processes, and also offering their leathers to the Shenk-Adams company customers, making the plain statement that they were doing so, and on account of the new tariff having removed the duty from all kinds of leather they could name a lower price.

"This as a matter of course would do an irreparable injury and make a very strong competition for the American tanners. They, therefore, brought suit for an injunction which was promptly granted by the Canadian court. Clarke & Clarke, Ltd., realizing the impossibility of having the injunction dissolved, settled the case out of court, conceding everything the injunction could have done and fully recognizing the rights of the Boston concern, promptly discharged Stryker.

"The injunction as against Stryker still remains in full force and effect showing conclusively that a tanner or anybody else having trade secrets can protect themselves against dishonest and

disloyal employes who wrongfully seek to appropriate what does not belong to them so as to benefit themselves to the loss of their employer, who must of necessity put them in possession of all his trade secrets in the regular and necessary course of business. Stryker was originally employed as a helper by F. D. Shenk who originated the business and sold out his formulas, good will, right, title and interest to Stone, Timlow & Co., Inc., who retained Stryker in their employ under a trade secret agreement.''

## B.

## "Trade secret injunction granted.

"A case of much interest to tanners and others showing the value and importance of trade secret agreements between employer and employes has just been settled out of court. Stone, Timlow & Company, Inc., of Boston and West Medford, brought suit in the Supreme Court of Ontario in Toronto recently to restrain Clarke & Clarke, Ltd., and Jacob Stryker, by injunction from making use of certain secret formulas, recipes, and methods of manufacturing and other trade secrets used by the corporation in the special beaming and preparation of hides and skins for tanning into Spanish and Morocco furniture leathers by the Shenk-Adams Company, which is owned and controlled by Stone, Timlow & Company, Inc. This corporation has always taken the precaution to have every employe sign a trade secret agreement making it a condition of their employment not to use, sell, give away, or make known, any of the corporation's trade secrets while in their employ or thereafter.

"Notwithstanding such a contract their principal man, Jacob Stryker, left them some months ago and went to Clarke & Clark, Ltd., of Toronto, and undertook to make the same Shenk-Adams leathers for this company by the same methods and processes, and also offering their leathers to the Shenk-Adams Co. customers, making the plain statement that they were doing so, and on account of the new tariff having removed the duty from all kinds of leather they could name a lower price.

"This as a matter of course would do an irreparable injury and make a very strong competition for the American tanners. They, therefore, brought suit asking for an injunction which was promptly

granted by the Canadian court.  Clarke & Clarke, Ltd., realizing the impossibility of having the injunction dissolved, settled the case out of court, conceding everything the injunction could have done and fully recognizing the rights of the Boston concern, promptly discharged Stryker.

"The injunction as against Stryker still remains in full force and effect showing conclusively that a tanner or anybody else having trade secrets can protect themselves against dishonest and disloyal employes who wrongfully seek to appropriate what does not belong to them so as to benefit themselves to the loss of their employer, who must of necessity put them in possession of all his trade secrets in the regular and necessary course of business. Stryker was originally employed as a helper by F. D. Shenk who originated the business and sold out his formulas, good will, right, title and interest to Stone, Timlow & Company, Inc., who retained Stryker in their employ under a trade secret agreement.  Stryker wanting a change, chose Toronto, Canada, expecting to transfer the American business there.

"The case of Stone, Timlow & Company, Inc., against Clarke & Clarke, Ltd., and Jacob Stryker, was the first case of the kind ever brought in Canada.  Notwithstanding, there was no trouble or delay in securing this injunction.

"The first tannery case in America to be decided was that of R. G. Solomon of Newark, N. J., about fifteen years ago, originators and makers of the Cordovan leathers.  Since that time there have been several others so that the courts have established the right of ownership to trade secrets and will protect them against any employe's dishonesty."

In the Superior Court the cases first were tried before *Bell*, J. At the close of the evidence the defendants asked for certain rulings, which the judge refused to make, and the judge gave certain instructions to the jury at the request of the plaintiff, to which the defendants excepted.

In each of the cases the judge submitted to the jury the following questions, to which they returned the answers that are appended:

"1. Was or was not the article published in Medford Mercury a libel on the plaintiff?"  The jury answered, "Yes."

"2. Was or was not the article published in the Medford Messenger, a libel on the plaintiff?"  The jury answered, "Yes."

"3. Was or was not the article published in the Shoe and Leather Reporter a libel on the plaintiff?" The jury answered, "Yes."

"4. Was or was not the article in the Medford Mercury published by the request of Albert H. Stone, the defendant?" The jury answered, "Yes."

"5. Was or was not the article in the Medford Mercury published by the authority of Stone, Timlow and Company, the defendant?" The jury answered, "Yes."

"6. Was or was not the article in the Medford Messenger published by request of Albert H. Stone, the defendant?" The jury answered, "Yes."

"7. Was or was not the article in the Medford Messenger published by authority of Stone, Timlow and Company, the defendant?" The jury answered, "Yes."

"8. Was or was not the article in the Shoe and Leather Reporter published by request of Albert H. Stone, the defendant?" The jury answered, "Yes."

"9. Was or was not the article in the Shoe and Leather Reporter published by authority of Stone, Timlow and Company, the defendant?" The jury answered, "Yes."

"10. Were or were not either or all of the libellous statements, if any, of said publications substantially true? State which, if any, were untrue?" The jury answered, "Not true. Cannot agree to his loyalty. No proof of his making the same leather. No proof of his dishonesty."

"11. Were or were not said publications made in the fair and honest prosecution of the rights of either defendant or the protection of the interests of either defendant?" The jury answered, "No."

"12. If any libellous statement was published by the request of the defendant, Albert H. Stone, was or was he not actuated by actual malice in so publishing?" The jury answered, "Yes."

"13. If any libellous statement was published by the authority of the defendant, the Stone, Timlow and Company, was or was not it actuated by actual malice in so publishing it?" The jury answered, "Yes."

"14. Was the contract of employment of Jacob Stryker

"(a) Broken by him?" The jury answered, "Yes."

"(b) Or terminated by consent?" The jury answered, "No."

"15. Was or was not the contract of employment void as in unreasonable restraint of trade?" The jury answered, "Yes."

"16. What, if any, sum is a fair and just compensation to the plaintiff for any libel published by the defendant?"

"(a) Injury to his feelings." The jury answered, "$2,000."

"(b) Injury to his character." The jury answered, "$2,000."

"(c) Injury to his earnings." The jury answered, "$5,000."

The judge in each of the cases ordered a general verdict for the plaintiff in the sum of $9,000.

The defendants in each case alleged exceptions, which were allowed by the judge.

The defendants in each case also moved for a new trial. This motion was heard by *Bell,* J., who made the following memorandum of decision:

"The answers to the first fourteen questions I cannot disturb as there was evidence to support the findings of the jury.

"The answer to the fifteenth I think to be wrong as a matter of law. The contract did not go further than was reasonably necessary to protect the defendant. This answer must be set aside.

"Clause (c) of the answer to the sixteenth question falls with the answer to the fifteenth question and the verdict so far is unsupported and must be set aside.

"But I am further of opinion that all the findings as to damages are excessive. The libels had been preceded by a long and bitter controversy between the parties with much ill will and a law suit. I saw during the trial that it would be difficult to keep the jury to the libel alone. After the verdict I was satisfied that the jury gave, without discrimination, damages for what the plaintiff suffered in the whole quarrel. It was difficult to separate the different causes of his mental suffering and of the injury to his character and he was anxious to charge them all up to the libel which was only one incident in the controversy. And the jury did so too.

"I feel certain that one half the amount allowed would be a very liberal allowance as compensation for the injury caused by the libels.

"I therefore grant the motion for a new trial on the matter of damages unless within thirty days from the filing of this order, the

plaintiff remits one half of each item of damages found by the jury."

The plaintiff having failed to make the remission of damages required, there later was a new trial on the matter of damages only before *Sanderson,* J. At this trial the jury returned a verdict for the plaintiff in the sum of $1,250 in each case. Both the plaintiff and the defendants alleged exceptions.

*F. W. Fosdick,* for the plaintiff.

*F. L. Norton,* (*M. Jenney* with him,) for the defendants.

DE COURCY, J. These are two actions for libel, one brought against a corporation of which the plaintiff was a former employee, and the other against its president. After a trial of both actions, together, verdicts for the plaintiff were set aside as to damages, and a second trial was had on the question of damages only. The cases are here on exceptions taken by the defendants at both trials, and on the plaintiff's exceptions taken at the second one. We consider first the exceptions of the defendants at the earlier trial.

1. Fourteen of these relate to the admission and exclusion of evidence. The first, third and fourth were to the admission of the published articles containing the alleged libels in the Shoe and Leather Reporter, the Medford Messenger and the Medford Mercury. There was ample evidence during the trial connecting the defendants with these publications and the order of proof rested in the discretion of the judge. The conversation between the defendant Stone and the publisher of Medford Mercury (exception second) was admissible at least to show that Stone procured the publications in that paper; and he later admitted that he acted as a properly authorized officer of the defendant corporation in his acts with reference to the case. Exceptions fifth and sixth, to the admission of the plaintiff's denials of certain alleged libellous statements in the articles were not argued, and are waived. The letters of the defendant corporation to the Medford Mercury (exception eighth) and to the Medford Messenger (exception ninth) plainly were admissible in view of the testimony of the stenographer, Miss Morton. *Slotnick* v. *Silberstein,* 221 Mass. 59. The paragraph in the Shoe and Leather Reporter stating that Stryker had resigned his position with a view of going into business in Canada (exception tenth) was submitted

by the defendant Stone, with an offer of proof that it affected
him (Stone) in voluntarily going to Canada.  The judge rightly
excluded it as immaterial.  The five letters of Clarke and Clarke,
Ltd. of Toronto to their customers (exception eleventh) were
*res inter alios,* and not relevant to the present actions.

The defendant Stone, called as a witness by the plaintiff, was
inquired of as to a letter written by him to Clarke and Clarke, Ltd.
containing defamatory statements about the plaintiff, and tend-
ing to show actual malice on the writer's part (exceptions twelfth
and thirteenth).  It now is argued that the written statements
were too remote from the date of the alleged libel.  Assuming
that this ground of objection was called to the attention of the
trial judge, we cannot say that his discretion as to the scope of a
virtual cross-examination was exercised improperly, especially
in view of the charge on this subject.  Exception fourteenth, to
the admission of the defendant corporation's letter and inclosure
to the Shoe and Leather Reporter has not been argued, and is
waived.  All the exceptions of the defendant to the admission
and exclusion of evidence must be overruled.

2. The defendants made eighteen requests for rulings, the first
thirteen "separately as to each count in each case and the re-
mainder separately as to the second and third counts in each
case," and excepted separately to the refusal to make each of said
rulings requested.  It would serve no useful purpose to discuss
these in detail.  We have considered all that were argued, and
find no merit in them.  There was ample evidence of publication
and of malice; the questions raised were for the jury, and the
libellous character of the articles was determined by considering
each article in its entirety.  *Doane* v. *Grew,* 220 Mass. 171.  *Lothrop*
v. *Adams,* 133 Mass. 471.

3. The exceptions of the defendants to the giving of certain
instructions requested by the plaintiff have not been argued, and
we treat them as waived.  See *Howland* v. *George F. Blake Manuf.*
*Co.* 156 Mass. 543.

4. The same is true as to the exceptions taken to the ques-
tions submitted to the jury.  It is to be noted that the judge
set aside the answer to question fifteen, on the motion for a new
trial.

5. The defendants excepted to portions of the judge's charge.

Only one is argued; that "to the statement by the court that the defendants stand substantially alike." On the evidence this statement was correct.

As the answers of the jury established all the essentials of liability, there was no error in directing a verdict for the plaintiff. As to damages, the verdicts were set aside.

6. We next consider the exceptions taken by the defendants at the second trial, which was on damages only. The questions asked of plaintiff in cross-examination as to having shown his business card, while with Clarke and Clarke, Ltd. to people whom he had known as customers of the defendant corporation and as to his employment of an attorney in Canada, were excluded rightly as not material on the issue of damages. We find no error in the ruling, given at the plaintiff's request, to the effect that the truth or falsity of the charge of disloyalty which was contained in the libellous articles should not be considered, except, as under the evidence properly in the case, such truth or falsity might affect the amount of damages to be awarded by reason of that charge.

The only other exceptions argued by the defendants are those to the admission of certain testimony, and to instructions to the jury, all relative to the plaintiff's earning capacity. The defendants contend that as the plaintiff had a written contract to work for the defendant corporation until January 1, 1916, and as the jury at the first trial found that this contract was broken by him, therefore he could not recover damages for loss of his earning capacity. But the impairment of his earning capacity might be found to extend in its effects after the date when the contract was to expire. The conclusive answer to the contention of the defendants however is, that it assumes that the plaintiff might have gone back to work for the defendant corporation after it had published these libels. The jury did not so find. The charge on this subject was sufficiently favorable to the defendants in saying, "if you find that contract was still open to him after the libel was published and he reasonably ought to have gone back to that employment after that time, then I am going to permit you to consider his failure to do that, . . . if that was still open to him then he cannot have damages assessed;" and "unless you find he could have gone back you get to the question whether these publications did prevent him from obtaining employment during

part or the whole of the time since then." *Sweet* v. *Post Publishing Co.* 215 Mass. 450.

All of the exceptions taken by the defendants at the second trial must be overruled.

7. As to the plaintiff's exceptions at the second trial, it is difficult to see how the efforts of the plaintiff to get customers of the defendants for Clarke and Clarke, Ltd. was competent on the question of damages; but in our opinion the error of admitting it did not injuriously affect the substantial rights of the parties. St. 1913, c. 716, § 1.

The question whether the plaintiff might have gone back to work for the defendant corporation was one of fact for the jury on the evidence, and the judge rightly refused to rule as matter of law that he could not have returned to his former work.

The exceptions to the judge's refusal to give the rulings he requested have been waived. No error is shown in the portion of the charge dealing with the plaintiff's duty to make reasonable efforts to get work and so avoid injurious consequences. *Hussey* v. *Holloway*, 217 Mass. 100.

It follows from what we have said that the exceptions taken by the defendants in both trials, and those taken by the plaintiff in the second trial, all must be overruled.

*Ordered accordingly.*