COMMONWEALTH *vs.* PETER WILLIAM MAKAREWICZ.

Norfolk. October 4, 1955. — February 15, 1956.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & COUNIHAN, JJ.

*Practice, Criminal,* Opening statement by district attorney. *Evidence,* Admissions and confessions; Relevancy and materiality; Photograph; Res inter alios; On cross-examination; Of reputation; Opinion: expert; Experiment; Judicial discretion; In rebuttal. *Constitutional Law,* Due process of law.

There was no error at the trial of an indictment in permitting the district attorney in his opening statement to refer to an alleged confession of the defendant. [583]

At the trial of an indictment for murder of a girl near her home one evening, testimony of another girl as to a conversation in a store between her and the victim with respect to the time the victim had to be home that evening was properly admitted by the trial judge after he had ascertained that the defendant was in a position in the store to have overheard the conversation. [583]

At the trial of an indictment for a murder committed with extreme atrocity and violence, there was no error in the admission in evidence

of colored photographs, enlarged as they were projected upon a screen, of conditions which a pathologist discovered in an autopsy of the victim. [583–584]

Review by COUNIHAN, J., of procedure in Massachusetts with respect to the admission in evidence in criminal cases of alleged confessions, and of cases in the Supreme Court of the United States pertaining to whether confessions admitted were obtained by coercion, although without the use of physical force, in violation of the due process clause of the Fourteenth Amendment to the Federal Constitution. [584–587]

At the trial of an indictment of a boy fifteen years of age for murder at which an alleged confession made by the defendant at a police station shortly after the start of the third of three separate periods of questioning totaling about two hours by police between midnight and a little after nine o'clock in the morning was admitted in evidence, the time and conditions under which the questioning took place did not require exclusion of the confession as obtained by coercion. [587]

The content and form of questions put by police at a police station to a boy fifteen years of age suspected of murder did not require exclusion of his alleged confession, which he told his father was voluntary, at his subsequent trial for murder, notwithstanding remarks of incredulity by the police at the boy's stories and remarks about not beating him, not contended by his counsel to have constituted a threat of the use of force, which occurred in the middle of a half hour period of interrogation and were followed by restrained and proper questioning for the remainder of that period and by an interval of nearly six hours before the defendant was questioned again and confronted with certain physical evidence, whereupon he made the alleged confession. [587–589]

Conflicting testimony by police and a defendant fifteen years of age indicted for murder as to the physical and mental condition of the defendant during a nine hour period in the course of which he was questioned by police in three separate sessions totaling about two hours did not require that an alleged confession made by him shortly after the commencement of the third session be excluded at his trial on the ground it was involuntary. [589]

No error appeared at the trial of an indictment in the exclusion as res inter alios of a question asked by the defendant in cross-examination of a police officer as to his knowledge of a report of a certain meeting in a newspaper. [589–590]

At a criminal trial, there was no error in not allowing the defendant, as proof that he bore a good reputation prior to the crime charged, to show through the operator of a store, who had seen him in the store on many occasions but who was not qualified to testify with respect to his reputation, that he had always been orderly and well mannered on those occasions. [590–591]

At the trial of an indictment for murder of a girl whose body was discovered in the space between two automobiles in a garage, on the fenders of which the defendant's fingerprints were found, the opinion of a fingerprint expert as to the position the defendant must have been

in to place his fingerprints there related to a proper subject of expert testimony and was properly admitted in evidence.  [591]

No abuse of discretion nor error appeared, at the trial of an indictment of a defendant who said in an alleged confession that he had climbed through a certain window immediately after committing the crime, in allowing a police officer to describe how he had climbed through that window four months after the crime.  [592]

Questions in cross-examination of the defendant at a criminal trial with respect to his answers to questions by police before the trial and to his contradiction thereof on direct examination were admissible in the discretion of the trial judge.  [593]

No abuse of discretion appeared at a criminal trial in the admission in rebuttal of testimony from witnesses for the Commonwealth contradicting the defendant's testimony.  [593–594]

INDICTMENT, found and returned on December 10, 1954.

The case was tried in the Superior Court before *Goldberg, J.*

*Louis Goldstein,* for the defendant.

*Myron N. Lane,* District Attorney, (*Edward H. Libertine,* Assistant District Attorney, with him,) for the Commonwealth.

COUNIHAN, J.  On December 10, 1954, the grand jury for the county of Norfolk returned an indictment against the defendant, the first count of which charged that the defendant on or about November 4, 1954, at Norwood "did assault and beat Geraldine Annese, with intent to murder her, and by such assault and beating did kill and murder the said Geraldine Annese"; the second count is substantially the same as the first except that after the words "with intent to murder her" are added the words "by manually strangling her."

The defendant pleaded not guilty and was put on trial before a jury.  The trial was subject to G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended by St. 1939, c. 341, and St. 1954, c. 187, § 1.  The jury returned a verdict of guilty of murder in the first degree with a recommendation that the death sentence be not imposed.  G. L. (Ter. Ed.) c. 265, § 2, as appearing in St. 1951, c. 203.  Thereafter the judge imposed a sentence of life imprisonment at the State prison. The case comes here upon the defendant's appeal accom-

panied by fifteen assignments of error based upon exceptions taken at the trial and a transcript of the evidence. G. L. (Ter. Ed.) c. 278, §§ 33A–33G. The assignments of error will be considered hereinafter in their numerical order. There was no error.

In our discussion hereafter we shall refer to the defendant as Peter and the deceased as Gerry. There was evidence that they were both about fifteen years old and had attended the same school in Norwood. Gerry lived with her parents on the day of the alleged murder at No. 13 Tremont Street in Norwood and Peter lived with his parents at the corner of Tremont Street and Washington Street about three hundred feet away. They were neighbors and friends. On that day Gerry was menstruating and did not attend school. In company with a friend, Cynthia Savage, a girl of about the same age, Gerry spent most of the day at her sister's home in Walpole. They left there about 4 P.M. and each went home. As a result of a telephone call from Gerry they met about 7 P.M. at Wiseman's store in Norwood. Cynthia was there first and Gerry came in and told her that the boys with whom they had a "date" that evening were outside waiting for them and that she had to be home by ten o'clock. Peter was in the store at the time within easy hearing distance of the girls.

The girls left the store and went for an automobile ride with three boys. They stopped at several places including "Doug's" where Gerry had a milk shake. After driving around for a while they drove Gerry to the corner of Tremont and Washington streets where they let her out of the automobile about five or ten minutes of ten. Gerry then walked along Tremont Street toward her house. Adjacent to the building in which she lived and to the rear of it was a two car garage with two overhead doors. On the evening of the alleged crime the garage was occupied by two automobiles. As one looked at the garage from the street the automobile of one Kalliel occupied the left side and the automobile of one Freund occupied the other side. Kalliel left his automobile in the garage at about 7 P.M. on No-

vember 4, 1954, and closed the door. Freund left his automobile in the garage about 6:45 P.M. the same evening.

At about 6:30 A.M. on November 5 Kalliel went to the garage to get his automobile to go to work. Both doors of the garage were then closed. He opened the left door of the garage and entered it. He looked over the left side of his automobile, got in the left door, and backed out. He saw nothing unusual in the garage at that time presumably because he did not look to the right side of his automobile. About 7:25 A.M. Freund approached the garage to get his automobile. Through the open door on the left side he saw a body lying on the floor of the garage. Its position was in the space between the two automobiles as they had been parked there. He ran home and told his wife to have the landlord call the police. He then went back to the garage and observed the body of a "woman," clad only in white stockings, lying on the floor. The right door of the garage was closed. Female clothing was strewn all over the garage. He went back a third time and saw the family of Gerry in the garage. They identified the body as that of Gerry.

The police arrived shortly. Soon the medical examiner came, and soon thereafter Dr. Bjornson, a pathologist, who was attached to the Harvard Medical School and to the State police. After they made a "gross examination" of the body they removed it to the Norwood Hospital where Dr. Bjornson in the presence of the medical examiner performed an autopsy. The examinations disclosed that the nail of the left middle finger of Gerry was broken off close to the nail bed. There was dirt on her upper lip and in her nostrils. There was a laceration in the vagina although the hymen was intact. The anus was dilated and spermatozoa were present in the rectum. The pathologist gave his opinion that death was caused by asphyxiation as the result of manual strangulation. As he testified the pathologist illustrated what he saw by the use of enlarged color photographs produced upon a screen.

Peter was taken to the Norwood police station shortly after midnight of November 5 and put under arrest about

10:10 A.M. on November 6. From the time he arrived at the station he was questioned on three separate occasions by District Attorney Lane, Chief of Police Folan of Norwood, Lieutenant Delay and Sergeant Bogdanchik, both of the State police, and several other officers. Mr. Kenney, a stenographer attached to the office of the district attorney, took what was said and later testified from a transcript of his notes. The first interrogation was from 12:15 A.M. to 1:45 A.M.; the second from 3:18 A.M. to 3:45 A.M.; and the third from 9:12 A.M. to 10:07 A.M. In the meantime he was permitted to rest and sleep and was given some coffee and doughnuts.

About 2 A.M. on November 6 one Topjian, an expert chemist of the department of public safety, came to the police station where he saw and talked with Peter. Later, after Peter had removed his clothing, Topjian applied benzidin tests to the body of Peter who willingly submitted to such tests. This test is to discover the presence of human blood which may not be seen upon "gross examination." The test showed blood on Peter's left wrist, his upper left arm, the back of his neck, and the entire area of his groin. He took the dungarees and gloves which Peter was wearing at the time of the crime to a laboratory and applied the same tests. He found the presence of blood on the fly and on the lower right leg of the dungarees and on the finger of the left glove. This blood was consistent with the blood of Gerry but not with that of Peter. Between the second and third interrogations of Peter, Topjian reported the results of his tests to the police and returned the clothing to the police station.

There were inconsistencies in the statements of Peter in his first two interrogations at the police station as well as in his talk with Topjian.

Peter was brought into the chief's office at 9:12 A.M. for further questioning. There were then present District Attorney Lane, Chief of Police Folan of Norwood, the lieutenant and the sergeant of the State police, a lieutenant of the Norwood police, and Mr. Kenney. After some pre-

liminary questions Peter was told of the results of the examination of the chemist and the discovery of his fingerprints on the fenders of the automobiles which were in the garage at the time of the murder. His dungarees and gloves were placed on the chief's desk. He was being further questioned about these circumstances when he broke down. He violently swept the dungarees and gloves off the desk and began to cry. After he regained his composure he confessed to committing the crime. After a voir dire examination before the judge in the absence of the jury the confession was admitted in evidence.

In this confession Peter said in substance that he was lying on a bed with a younger sister whom he was trying to get to sleep when he conceived the idea of killing Gerry. He put on his dungarees which were the ones examined by Topjian and left his home about 9:35 P.M. by way of the cellar door in the rear of the house. He walked over to a barbed wire fence located at the side of "Rocky's" garage. He jumped over this fence and then over another one and walked to the garage. He lifted the left door of the garage, went inside, and waited for Gerry. After about fifteen minutes he saw her running down the street, and as she was going along the side of her house to go up the back stairs, he hollered to her, "Hi, Gerry, come here." She said, "Who is it?" He said, "Markie." She said, "What do you want?" and he said, "Come over here. I want to tell you something." She then came over and into the garage. He pulled the door down and told her to go into the space between the automobiles and turn around. When she did so he put his hands around her throat and strangled her. He held his hands around her throat for fifteen or twenty minutes and when her hands ceased to move he released his hands. She fell to the dirt floor of the garage, and as she was lying there he took off all of her clothes except her stockings and had intercourse with her. She was then dead. After that he turned her body over on her face. He "noticed Kotex on her panties." He said that when he was getting up from the ground he put his hands on the fenders

of the automobiles. During the struggle with Gerry she scratched his cheek. He then went out through a side window of the garage and retraced his steps to his cellar door. As he was climbing over a fence in the back of "Rocky's" garage he broke a picket. He got home about quarter of twelve.

After he had confessed, his father was brought into the office and was told that Peter had confessed to the killing of Gerry. His father looked at Peter and said, "Junior, you didn't do that. You were tired and they made you say it." Peter answered, "No. I did it." Shortly thereafter he went to his house with Lieutenant Delay and other police officers and reënacted what he had done before and after the commission of the crime. He pointed out the picket on a fence which he said he had broken as he climbed over it. There was evidence that no force or threats were used nor were any inducements offered him to cause him to confess.

There was evidence that a police officer of Norwood took palm prints and fingerprints of Peter at the station. There was also evidence from a fingerprint expert of the State police that he discovered palm prints and fingerprints on the fenders of both automobiles which were in the garage when the crime was committed, which he compared with the record prints which were taken of Peter's palms and fingers, and found them to be the same. He further testified that a person of normal height would have to be in a crouched or stooped position in order to put the print on the automobile of Kalliel which he discovered there.

There was evidence from Lieutenant Murphy of the Norwood police that he was about five feet nine and one quarter inches in height and weighed about two hundred twenty-five pounds. He went to the garage and opened the window on the right side of it and climbed through it.

Peter in his testimony denied that he killed Gerry. He said he was questioned continuously from shortly after midnight until after ten o'clock in the morning by most if not all of those present in relays, without food or sleep, so that

he was in a state of collapse during the last interrogation and he did not know what he said by way of confession or what he did or said during the reënactment of what happened before and after the commission of the crime. Other evidence will be referred to in the discussion of the assignments of error.

We have carefully examined all of the assignments of error filed by the defendant. They are all without merit.

The first assignment of error attacks the action of the judge in permitting the district attorney to refer in his opening to the alleged confession of Peter. "The defendant excepted on the ground that the facts making the confession competent had not then been proved. As a general rule, counsel is free to state in his opening anything that he expects to be able to prove by evidence. *Commonwealth* v. *Howard*, 205 Mass. 128, 146. . . . In the present case no reason why the confession would not be admissible was stated by counsel for the defendant. There was no error in refusing to restrict the opening. *Commonwealth* v. *Mercier*, 257 Mass. 353, 365." *Commonwealth* v. *Clark*, 292 Mass. 409, 410.

The second and third assignments of error relate to the refusal of the judge to strike out the testimony of Cynthia Savage as to the conversation between her and Gerry at Wiseman's store on November 4 relative to the time Gerry had to be home that evening. The judge made a searching examination to ascertain whether Peter was in a position to overhear such conversation, found that he was, and allowed the testimony to go in. Plainly it was for the jury to determine whether or not Peter overheard this talk and from it realized that Gerry was expected to be home by 10 P.M. *Commonwealth* v. *Klosowski*, 252 Mass. 149, 151. *Commonwealth* v. *Saltzman*, 258 Mass. 109, 110. *Commonwealth* v. *Hamel*, 264 Mass. 564, 570. *Holton* v. *Boston Elevated Railway*, 303 Mass. 242, 247.

The fourth assignment of error relates to the introduction in evidence as exhibits of several colored slides which were projected upon a screen during the testimony of the pa-

thologist.  The defendant excepted to their use and to their introduction as exhibits because they were inflammatory and prejudicial.  In passing we pause to note that all the evidence was such as to indicate that the crime was committed with such extreme atrocity and violence that these slides could add little to inflame or prejudice the jury.  No question is raised as to the identification of the slides or as to their being fair representations of the conditions which the pathologist discovered in the autopsy.  The question of their admissibility has been disposed of by a long line of cases which are cited in *Commonwealth v. Gray*, 314 Mass. 96, 98.  As to the enlargement of the photographs as they were projected on the screen the judge properly could and did find that they had been sufficiently verified and were fair representations of conditions which the pathologist found on the autopsy.  *Commonwealth v. Noxon*, 319 Mass. 495, 536–537.  Wigmore on Evidence (3d ed.) § 795.  It may be well to note that no case has been brought to our attention and we have found none, at least in this jurisdiction, where a distinction has been made between the use of ordinary photographs and the use of colored ones.  We are of opinion, however, that what was said in the *Noxon* case as to the use of enlargements and photomicrographs applies to enlargements of photographs in color.

The fifth assignment of error is based upon an exception of the defendant to the action of the judge in admitting in evidence the alleged confession of the defendant because the evidence disclosed that the defendant's physical condition at the time of the alleged confession was such as to render it an involuntary confession induced by fear and coercion.  The procedure generally followed in this Commonwealth when an alleged confession by the defendant is offered is to hold a voir dire examination in the absence of the jury on the issue of voluntariness and, if the judge finds that it was voluntary, to admit the confession and instruct the jury to disregard the confession entirely unless they find that it was made voluntarily.  *Commonwealth v. Bond*, 170 Mass. 41, 43.  This practice was followed in the case at bar.

"It is established that a confession of guilt drawn from a defendant through threat or by promise of favor is not admissible because not voluntarily made, but induced by coercion or promise of benefit. *Commonwealth* v. *Chabbock,* 1 Mass. 144. *Commonwealth* v. *Sherman,* 294 Mass. 379, 395. *Commonwealth* v. *Mabey,* 299 Mass. 96, 98, 99. Whether a confession was voluntarily made is a question on a preliminary hearing, if one is requested or held, for the determination of the judge in the first instance. If satisfied that it was so made, he admits it, allowing the jury to pass upon the testimony as to the circumstances under which it was made, with instructions to the jury to give it such weight as they feel it is entitled to and to reject and disregard it if they are satisfied that it was not voluntarily made. *Commonwealth* v. *Russ,* 232 Mass. 58. The weight to be given to the evidence taken at the preliminary hearing with relation to . . . [the confession of the defendant] was for the judge. He was not bound to give credit to the testimony of . . . [the defendant] as to the circumstances under which he made the confession. *Commonwealth* v. *Mabey,* 299 Mass. 96, 97, 98. He saw the witnesses and was satisfied to let the confessions in. *Commonwealth* v. *Bond,* 170 Mass. 41, 44." *Commonwealth* v. *Sheppard,* 313 Mass. 590, 603–604. The record shows that the voir dire was held and the judge found that the confession was voluntary; that the charge properly submitted the confession to the jury; and that a finding of compulsion was not required. *Commonwealth* v. *McGarty,* 323 Mass. 435, 438.

The defendant argues that the confession was coerced and relies upon *Haley* v. *Ohio,* 332 U. S. 596. Because of this contention a review of cases in the Supreme Court of the United States on this issue is pertinent. There was here no evidence or hint of physical coercion so that cases turning on that point may be disregarded. It is conceded that a confession may be coerced in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States without the use of physical force. The coercion may take many forms but the most

usual forms are continuous questioning and denial of access
to friends, family, and counsel. In the case at bar the de-
fendant testified that he was questioned all night with-
out interruption. If this were uncontradicted and with the
factor of the defendant's youth in the scale, the rule of
*Haley* v. *Ohio* might control. "The age of petitioner, the
hours when he was grilled, the duration of his quizzing, the
fact that he had no friend or counsel to advise him, the
callous attitude of the police towards his rights combine to
convince us that this was a confession wrung from a child
by means which the law should not sanction." *Haley* v.
*Ohio,* 332 U. S. 596, 600–601. But in the *Haley* case the
undisputed facts were that the defendant was questioned
continuously for five hours, that he was held incommunicado
for five days thereafter, and that his attorney tried to see him
twice in this period and was refused. In the case at bar the
defendant's testimony as to the period of questioning was
disputed. The police officers' testimony and the transcript
of the interviews indicated that the questioning took place
in three separate sessions over a ten hour period and that
the questioning before the confession totaled two hours,
broken up into two periods.

The Supreme Court of the United States in *Watts* v.
*Indiana,* 338 U. S. 49, at pages 51–52, set out the follow-
ing: ". . . in all the cases that have come here during the
last decade from the courts of the various States in which
it was claimed that the admission of coerced confessions
vitiated convictions for murder, there has been complete
agreement that any conflict in testimony as to what ac-
tually led to a contested confession is not this Court's
concern. Such conflict comes here authoritatively resolved
by the State's adjudication. Therefore only those elements
of the events and circumstances in which a confession was
involved that are unquestioned in the State's version of
what happened are relevant to the constitutional issue here.
But if force has been applied, this Court does not leave to
local determination whether or not the confession was vol-
untary."

The real question raised by the fifth assignment of error is whether the circumstances leading to the confession were so coercive as to render it inadmissible. The Supreme Court in *Stein* v. *New York*, 346 U. S. 156, at pages 184–185, said, "Interrogation is not inherently coercive, as is physical violence. Interrogation does have social value in solving crime, as physical force does not. . . . This Court never has held that the Fourteenth Amendment prohibits a state from such detention and interrogation of a suspect as under the circumstances appears reasonable and not coercive. Of course, such inquiries have limits. . . . The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Commonwealth* v. *Myers*, 160 Mass. 530, 532, and *Commonwealth* v. *Mabey*, 299 Mass. 96, 98, are in accord with this view.

The relevant circumstances in the case at bar appear to be (1) the time and conditions under which the questioning took place; (2) the content and form of the questions put to the defendant by the police; and (3) the physical and mental condition of the defendant during the period during which he was questioned.

(1) The Commonwealth's version of events leading to the confession is this. The defendant was questioned on the morning of November 6, first from 12:15 A.M. to 1:45 A.M. After this first interview he was taken out and certain chemical tests for the presence of blood on his person and clothing were made. Thereafter he was again questioned from 3:18 A.M. to 3:45 A.M. After this he was allowed to rest and was given coffee and food while the results of the chemical tests and fingerprint tests were awaited. After the results of these tests were reported and his clothing was returned he was recalled for further questioning from 9:12 A.M. to 10:07 A.M. These circumstances of themselves appear reasonable and proper.

(2) We now consider the actual content and form of the questioning complained of by the defendant. Most of the questions and remarks of the police appear to be entirely

proper. The transcript of these interrogations introduced through the testimony of Mr. Kenney discloses that the only possible questions to which objection could be made were certain remarks of Sergeant Bogdanchik. Among other remarks he said, "Don't clown." "Your story is very foolish. . . . You don't expect anybody to believe that story, do you?" In view of occasional flippancy on the part of the defendant and serious apparent inconsistencies in his narrative we cannot say that remarks of this type were so unreasonable and coercive as to require the confession to be excluded. *Stein* v. *New York*, 346 U. S. 156.

The nearest approach to coercion is presented by other remarks of Sergeant Bogdanchik in which he said, "Look, Peter, let's not make it an all week's project." "There has been a serious thing committed and you are going to stay here until we find out what's behind your story and other things. We are not going to spend a week for you. . . . We are going to stay here a week, or ten weeks, or ten years until we find out. We are not clowning with you. We are gentlemen, aren't we?" The defendant answered, "Yes." "We haven't taken you down the back room and beat your ears." The defendant answered, "No."

These remarks should not have been made, but having in mind that the coercive effect of all the circumstances leading to the confession is to be considered, we are of opinion that the remarks did not render the confession inadmissible. The remarks occurred about in the middle of the second period of interrogation between 3:18 A.M. and 3:45 A.M. They were followed by restrained and proper questioning for the remainder of that session. The defendant did not confess until shortly after the beginning of the third period which lasted from 9:12 A.M. to 10:07 A.M. and then only after he was confronted with physical evidence tending to show that he had committed the crime. It is significant too that he admitted to his father that his confession was voluntary. It is important also to note that in his brief counsel for the defendant does not argue that the remarks of the sergeant about beating the defendant which we have quoted

constituted a threat of the use of force. It was said in *Lyons v. Oklahoma,* 322 U. S. 596, at page 603: "Review here deals with circumstances which require examination into the possibility as to whether the judge and jury in the trial court could reasonably conclude that the . . . confession was voluntary." In this connection it is important to recall what was said by Justice Holmes in *Commonwealth* v. *Bond,* 170 Mass. 41, at page 44, "In the case at bar, considering the boy's capacity, there were strong reasons in the way in which he was treated for hesitating to accept his confession. . . . Nevertheless, it purports on its face to be made of his own free will, without hope of favor . . . . The judge who tried the case and saw the parties was satisfied to let it in, and we must presume that the jury were of his opinion. We cannot say, as matter of law, that the admission of the evidence was wrong." See *Commonwealth* v. *Myers,* 160 Mass. 530, 532–533.

(3) There was a marked conflict in the testimony. The police testified that there was no sign of any weakened physical or mental condition of the defendant during the periods in which he was questioned. On the other hand the defendant testified in substance that because of the continuous questioning during the morning of November 6 he became so physically exhausted that he collapsed and did not know what replies he gave to the police. In these circumstances, because of what we have hereinbefore said, we are of opinion that the physical and mental condition of the defendant was a question of fact to be determined by the jury under appropriate instructions of the judge.

It is significant that at the conclusion of the charge the judge asked counsel if they wanted to say anything to the judge before the jury retired and counsel for the defendant replied, "No, I want to thank your Honor very much for what you have said."

The sixth assignment of error is based upon an exception to the exclusion of a question in the cross-examination of Chief Folan as follows: "Had it come to your attention that Mr. McLean had reported this meeting in his newspaper?"

This question was properly excluded as res inter alios and not relevant. *Stryker* v. *Stone, Timlow & Co. Inc.* 227 Mass. 253, 261. Moreover this was a question put in cross-examination and cross-examination of a witness must be largely left to the sound discretion of the judge unless substantial rights of a party are clearly shown to have been prejudiced. *Commonwealth* v. *Corcoran,* 252 Mass. 465, 486. *Commonwealth* v. *Granito,* 326 Mass. 494, 496.

The seventh assignment of error is based upon the exclusion of a question put to the witness John E. Howard in cross-examination. In direct examination, without objection, Howard testified that he operated a variety store and "luncheonette" in Norwood and that the defendant was in his store on the evening of November 5, 1954, between ten thirty and eleven o'clock. He observed the defendant holding a drink of some kind in his hand. The defendant sat on a stool at a counter, turned his back on Howard, and stared at the floor for several minutes. Some other boys in the store asked Howard, "What's the matter with him? Is he in a trance?" On cross-examination Howard testified that he had seen the defendant in the store on many occasions prior to November 5, 1954. Counsel for the defendant then asked him, "Have you had an opportunity to observe his conduct in your store previous to November 5, 1954?" Upon objection this question was excluded. The defendant relies upon *Commonwealth* v. *Borasky,* 214 Mass. 313, but in that case at page 319 it was said, "The conduct and appearance of the defendants, after the crime had been committed, was competent as bearing upon their guilt." But here the excluded question sought to introduce evidence bearing upon the conduct and appearance of the defendant before the crime. It was clearly inadmissible for this purpose.

The transcript of testimony shows that counsel made an offer of proof to the effect that the witness would state that "the boy has always been well mannered and never given any trouble or had any arguments, no belligerent attitude towards anyone in the store . . . [or] while he has been in

his store." By this offer of proof he apparently intended, and so argued, to prove that the defendant bore a good reputation prior to the crime. But the record does not show that the witness was qualified to testify on this matter. *Commonwealth* v. *Boris,* 317 Mass. 309, 318. *Commonwealth* v. *Farrell,* 322 Mass. 606, 624. In any event in view of all the evidence it is difficult to see how the exclusion of this question could have injured the defendant.

Assignments of error numbered 8, 10, and 11 are treated together because all are based on exceptions taken to the overruling of objections by the defendant to questions put to fingerprint experts in direct examination as to their opinion of the position the defendant must have been in to place his fingerprints on the fenders of the automobiles where they were found.

An examination of the transcript shows that the reason for the opinion was given by the expert in each case. Matters such as these are outside the range of common experience and depend upon an extended experience with fingerprinting and the manner in which fingerprints are transferred from the finger or hand to a foreign object. "It cannot be assumed that the knowledge of jurors is so varied or extensive that they would not be instructed and aided by testimony of this nature." *Commonwealth* v. *Russ,* 232 Mass. 58, 78. "It is true that there is no room for the opinion of an expert if the subject of his testimony is of such a nature that it may be presumed to be within the common experience of men. But, if this is not the situation, the testimony of a qualified expert is admissible for such help as it may, if believed, give to the trier of facts. *Jackson* v. *Anthony,* 282 Mass. 540, 544." *Flynn* v. *Growers Outlet, Inc.* 307 Mass. 373, 376. "There is no prescribed formality for the admission of expert testimony. All that is necessary is that the subject matter be one about which special knowledge beyond that possessed by the ordinary juryman will aid the jury in their deliberations, and that a person possessing such knowledge give opinions pertinent to the issues of the case founded upon facts which either are con-

ceded or could warrantably be found upon other evidence. The judge may order or permit the use of any proper method that conforms to these requirements." *Lovasco* v. *Parkhurst Marine Railway*, 322 Mass. 64, 67.

Assignment of error numbered 9 is based upon an exception taken to the admission of testimony by Lieutenant Murphy of the Norwood police as to an experiment conducted by him. This testimony was to the effect that on March 10, 1955, he went to the garage where the body of Gerry was found. He measured and climbed through the side window in the garage which Peter said in his confession he had climbed through after committing the crime. The witness testified that he weighed two hundred twenty-five pounds and that he was five feet nine and one quarter inches tall. He was asked to describe just how he climbed through the window. Counsel for the defendant objected on the ground that what the witness did on March 10, 1955, was immaterial. The defendant's counsel admitted that there had been no change in the size of the window from November 4, 1954, to March 10, 1955. The question and answers were admitted by the judge as bearing on the question whether a person of the weight and height of the witness could climb through that window. "Whether testimony as to experiments shall be admitted must be largely left to the discretion of the trial judge, and that discretion will not be interfered with unless in its exercise he clearly appears to be wrong. *Commonwealth* v. *Tucker*, 189 Mass. 457, 478. *Dow* v. *Bulfinch*, 192 Mass. 281, 285. *Thornhill* v. *Carpenter-Morton Co.* 220 Mass. 593, 599. Testimony as to experiments made at times other than the time of the main occurrence at issue has frequently been received, and not infrequently rejected in the discretion of the trial judge. *Baker* v. *Harrington*, 196 Mass. 339, and cases cited. Although it must appear that the conditions or circumstances were in general the same in the illustrative case and the case in hand, *Commonwealth* v. *Piper*, 120 Mass. 185, *Biancucci* v. *Nigro*, 247 Mass. 40, 43, the determination whether the conditions were sufficiently similar to make the experiments

of any value in aiding the jury is a matter resting in the
sound discretion of the judge. *Field* v. *Gowdy,* 199 Mass.
568, 574." *Guinan* v. *Famous Players-Lasky Corp.* 267
Mass. 501, 521–522.

The twelfth assignment of error is based on a series of
exceptions taken by the defendant to the overruling of ob-
jections to questions put to the defendant by the district
attorney on cross-examination. No useful purpose would
be served by reciting these questions verbatim. The ques-
tions objected to concerned the answers of the defendant to
the police as shown by the transcript of Mr. Kenney, intro-
duced by the Commonwealth, and the contradiction of these
answers by the defendant in direct examination. "[T]he
scope of cross-examination, including to what extent the
accuracy, veracity, and credibility of a witness may be
tested, rests largely in the sound discretion of the judge,
not subject to revision unless prejudice is shown to a party
by reason of too narrow restriction or too great breadth of
inquiry. *Jennings* v. *Rooney,* 183 Mass. 577, 579. *Common-
wealth* v. *Corcoran,* 252 Mass. 465, 486." *Commonwealth* v.
*Smith,* 329 Mass. 477, 479. "[I]t is settled that how far
the cross-examination of a witness may be considered help-
ful and relevant to the issues on trial, as well as the extent
that the accuracy, veracity and credibility of a witness
may be tested, rests largely in the sound discretion of the
trial judge, and his action, where as here no abuse of dis-
cretion is shown, is final. *Commonwealth* v. *Phelps,* 210
Mass. 109, 114. *Commonwealth* v. *Patalano,* 254 Mass. 69,
72. *Gerber* v. *New York Central Railroad,* 288 Mass. 318,
321. *Baxter* v. *Bourget,* 311 Mass. 490, 492. *Common-
wealth* v. *Beal,* 314 Mass. 210, 229." *Commonwealth* v.
*Shea,* 323 Mass. 406, 417–418.

Assignments of error numbered 13, 14, and 15 all are
based on exceptions taken to the allowance of certain ques-
tions asked of the Commonwealth's witnesses called in re-
buttal. An examination of the transcript of the testimony
at the trial shows that these questions called for answers

tending to contradict the defendant's testimony and were properly admitted. *Commonwealth* v. *Sherman*, 234 Mass. 7, 12. *Commonwealth* v. *Galvin*, 323 Mass. 205, 217. In any event the admission of such testimony is discretionary with the trial judge, *Commonwealth* v. *Coggins*, 324 Mass. 552, 558, and no abuse of discretion is shown.

*Judgment affirmed.*